SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

### State of New Jersey v. Richard Willis (A-115-13) (073908)

**Argued October 7, 2015 – May 11, 2016**

**CUFF, P.J.A.D. (temporarily assigned) writing for a unanimous Court.**

In this appeal, the Court considers the admission of other-crime evidence pursuant to N.J.R.E. 404(b).

In 2007, a grand jury issued a four-count indictment against defendant, charging him with multiple offenses, including sexual assault. The charges arose from defendant's alleged sexual assault of K.M., which took place in April 2006. Before trial, the State informed the court that it would seek to introduce evidence of an attempted sexual assault against another young woman, N.J., which had occurred three years before the alleged sexual assault against K.M. According to the State, N.J. reported that defendant offered her a ride, drove her to a secluded location and attempted to sexually assault her. The State noted that the central issue in its case against defendant was whether K.M. consented and maintained that N.J.'s experience provided relevant and probative evidence of defendant's intent when he encountered K.M. Over defendant's objection, the trial court concluded that the proposed testimony satisfied each prong of the State v. Cofield, 127 N.J. 328, 338 (1992) analysis. The court found that N.J.'s testimony was relevant, that the acts alleged by N.J. were similar in kind and reasonably close in time to the incident involving K.M., and that the probative value of N.J.'s testimony outweighed any prejudice to defendant. The court noted that a limiting instruction would restrict the jury's consideration of the evidence.

At trial, K.M. admitted that she was a prostitute and had performed sexual acts with men other than the defendant on April 25, 2006, the day of the alleged sexual assault. She claimed that at 10:00 p.m. that evening, while walking home alone, a passing vehicle pulled over next to her. The driver asked her if she was working. K.M. said she was not, but asked if the driver was "Pookie," whom she knew from the methadone clinic she attended. When the driver replied, "Yeah. Don't I know you?" and asked if she wanted a ride, K.M. got into the vehicle. Once inside, she realized the driver was not Pookie, but she stayed in the car. The driver proceeded to a poorly lit residential area, parked, and turned off the engine. The driver grabbed her head and pushed it into his lap. Then, he got on top of her and pulled down her pants and underwear, and put his penis inside her vagina. When the driver rolled off of her, K.M. left the car as quickly as possible. Officer Craig Kennovin arrived at the scene and observed that K.M. was crying. He took her to the hospital, but K.M. was unable to consent to a rape kit because she was intoxicated. At 2:00 p.m. the following day, a Sexual Assault Nurse Examiner conducted a rape kit examination of K.M. Defendant's DNA, subsequently obtained pursuant to a court order, matched the semen recovered during K.M.'s examination.

Following the testimony of K.M., the responding police officers, and the nurse who conducted the sexual assault examination of K.M., the State presented N.J.'s testimony regarding her 2003 attempted sexual assault. As it had determined pretrial, the court informed the jury that it could not use the evidence advanced by N.J. to conclude that defendant had a tendency to commit criminal acts. The jury found defendant guilty of criminal restraint, sexual assault, and simple assault. Defendant was sentenced to a ten-year term of incarceration with an eighty-five percent parole disqualifier for the sexual assault conviction and a consecutive four-year term for the criminal restraint charge. The court also imposed a concurrent term of six months' incarceration for simple assault.

In an unpublished opinion, the Appellate Division affirmed defendant's conviction, but remanded for reconsideration of his sentence. The panel rejected defendant's argument that the trial court should have excluded N.J.'s testimony of the May 2003 attempted sexual assault. The panel concluded that defendant's intent was a material issue, the circumstances of the assaults experienced by K.M. and N.J. were similar, the three-year interval between the incidents was reasonably close in time, the evidence provided by N.J. was probative of defendant's intent regarding K.M., and the events described by N.J. were no more inflammatory than the events described by K.M. The Court granted defendant's petition for certification. 218 N.J. 532 (2014).

**HELD**: The relevance of an alleged sexual assault three years before defendant's encounter with K.M. was so marginal that it should have been excluded. Moreover, the erroneous admission of this evidence cannot be considered harmless as the quality and quantity of the evidence, introduced to inform the jury of defendant's intent in April 2006,

overwhelmed the State's case-in-chief.

1. This appeal focuses on the admission of a prior uncharged act of attempted sexual assault against a young woman who identified defendant as her assailant. N.J.R.E. 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. However, such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, when such matters are relevant to a material issue in dispute. Evidence of a defendant's previous misconduct has a unique tendency to prejudice a jury and must be admitted with caution. In Cofield, surpa, the Court established a four-prong test designed to avoid the over-use of extrinsic evidence of other crimes or wrongs. The test requires that: 1) the evidence of the other crime be admissible as relevant to a material issue; 2) the evidence be similar in kind and reasonably close in time to the offense charged; 3) the evidence must be clear and convincing; and 4) the evidence's probative value must not be outweighed by its apparent prejudice. (pp. 16-17)

2. The Court's review of the admission of the uncharged 2003 prior sexual assault of N.J. focuses on prongs one and four. Evidence is relevant if it has a tendency to prove or disprove any fact of consequence to the determination of the action. The material fact must be one that is actually in dispute and cannot merely be offered to indicate that because the defendant is disposed toward wrongful acts generally, he is probably guilty of the present act. In the context of a sexual assault, when a defendant claims that he penetrated the alleged victim with permission, he puts his state of mind in issue. Therefore, when a defendant claims the victim consented, the State may introduce evidence to disprove that the defendant had that state of mind. Even in the cases in which this Court has found that the trial court properly admitted other-crime evidence, the evidence must be relevant to a genuinely contested fact and its probative value must be critically evaluated to balance the relevance of the evidence and the prejudice its admission will cause. (pp. 17-19)

3. The fourth prong of Cofield requires that the probative value of the evidence not be outweighed by its apparent prejudice. When analyzing prejudice under N.J.R.E. 404(b), courts should also consider the factors presented in N.J.R.E. 403, which state that relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence. Since other-crimes evidence requires a more searching inquiry than that required by N.J.R.E. 403, the potential for undue prejudice need only outweigh probative value to warrant its exclusion. Thus, courts have interpreted N.J.R.E. 404(b) as a rule of exclusion rather than a rule of inclusion. Ultimately, if the party seeking to admit the evidence demonstrates the necessity of the other-crime evidence to prove a genuine fact in issue, and the court has carefully balanced the probative value of the evidence against the possible undue prejudice it may create, the court must instruct the jury on the limited use of the evidence. (pp. 19-21)

4. The N.J.R.E. 404(b) evidence permitted by the trial court concerned evidence presented by N.J., who testified that defendant attempted to sexually assault her in 2003. Defendant had been arrested, but never indicted for that incident. The assaults of K.M. and N.J. had certain common elements, but when evidence of a prior sexual assault is introduced to show a defendant's state of mind, great care must be taken to assure that the evidence is not used, even inadvertently, by a jury as evidence of a propensity to commit criminal acts. Here, the logical relationship between N.J.'s encounter with defendant three years before the assault of K.M. is marginal at best. Furthermore, the admission of evidence of the uncharged sexual assault caused undue prejudice to defendant. The amount of other-crime evidence produced at trial for the purpose of discerning defendant's intent on April 25, 2006, compared to the amount of evidence produced by the State in its case-in-chief, was so disproportionate that it had the clear capacity to distract the jury's attention from the case-in-chief and overwhelm any effort to cabin the jury's consideration of the limited role this evidence had at trial. Contrary to its ruling on the admissibility of N.J.'s other-crime evidence and the limiting instruction provided to the jury, the trial court invited the jury to consider the fact that N.J. also identified defendant as her assailant and that her description of her assailant was markedly similar to the description provided by K.M. of her assailant. The marginal relevance of a three-year-old attempted sexual assault against N.J. could not overcome the manifest prejudice of that evidence. It should not have been admitted. (pp. 21-24)

The judgment of the Appellate Division is **REVERSED**.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON and SOLOMON join in JUDGE CUFF's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

RICHARD WILLIS (a/k/a RICHARD
DWAYNE WILLIS, RICHARD DWAYNE
WILUS),

    Defendant-Appellant.

        Argued October 7, 2015 – Decided May 11, 2016

        On certification to the Superior Court,
        Appellate Division.

        Michael B. Jones, Assistant Deputy Public
        Defender, argued the cause for appellant
        (Joseph E. Krakora, Public Defender,
        attorney).

        Ian C. Kennedy, Deputy Attorney General,
        argued the cause for respondent (John J.
        Hoffman, Acting Attorney General of New
        Jersey, attorney).

    JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

    In this appeal, we address the admission of other-crime evidence, pursuant to N.J.R.E. 404(b), of an attempted sexual assault that occurred three years before the sexual assault that was the subject of defendant Richard Willis' trial. The State contended, and the trial court held, that the evidence of the

earlier uncharged offense was relevant to defendant's intent to commit the alleged sexual assault.

The 2008 jury trial concerned an April 2006 sexual assault against K.M. The victim was a twenty-two-year-old prostitute who readily admitted that she had performed various sex acts with men other than the defendant the day of the alleged sexual assault, but denied that she had consensual sexual relations with defendant. Defendant admitted that he had sexual intercourse with the victim but insisted that K.M. had consented. A jury found defendant guilty of third-degree criminal restraint, in violation of N.J.S.A. 2C:13-2(b); second-degree sexual assault, in violation of N.J.S.A. 2C:14-2(c)(1); and the disorderly persons offense of simple assault, in violation of N.J.S.A. 2C:12-1(a).

Although evidence of a defendant's state of mind is relevant in a sexual assault prosecution when the pivotal issue is whether the sexual acts were consensual, great care must be taken to assure that state-of-mind evidence does not become the vehicle for communicating to the jury that the defendant has a propensity to commit the type of offense for which he is being tried. Here, the relevance of an alleged sexual assault three years before defendant's encounter with K.M. was so marginal that it should have been excluded. Moreover, the erroneous admission of this other-crime evidence cannot be considered

2

harmless. The quality and quantity of the other-crime evidence of a May 2003 uncharged sexual assault, introduced to inform the jury of defendant's intent in April 2006, overwhelmed the case-in-chief. Evidence of the 2003 alleged sexual assault had the clear capacity to suggest to the jury that defendant had a propensity to commit sexual assaults on unwitting young women. Moreover, the scope of the evidence of the 2003 assault had the effect of bolstering a shaky identification of defendant by K.M., an effect underscored by a reference by the trial court to the 2003 victim's identification of defendant as unequivocal in the jury charge. In this case, other-crime evidence of an earlier attempted sexual assault was not only irrelevant but also had the clear capacity to cause manifest prejudice to defendant and should not have been admitted.

## I.

A grand jury issued a four-count indictment against defendant Richard Willis in 2007. Defendant was charged with kidnapping, contrary to N.J.S.A. 2C:13-1(b)(1), (2) (Count One); aggravated sexual assault, contrary to N.J.S.A. 2C:14-2(a)(3) (Count Two); sexual assault, contrary to N.J.S.A. 2C:14-2(c)(1) (Count Three); and aggravated assault, contrary to N.J.S.A. 2C:12-1(b)(7) (Count Four). The charges arose from the alleged sexual assault of K.M. in April 2006.

3

Prior to trial, the State informed the trial court and defense counsel that it would seek to introduce, pursuant to N.J.R.E. 404(b), evidence of an attempted sexual assault against another young woman, N.J., that had occurred three years before the alleged sexual assault against K.M. The State proffered that, in 2003, N.J. reported that defendant had offered her a ride, drove her to a secluded location, choked her, groped her, and attempted to sexually assault her. The State noted that the central issue in its case was whether K.M. consented to sexual relations with defendant because the forensic evidence clearly established that they had engaged in sexual relations that evening. The State maintained that N.J.'s experience provided relevant and probative evidence of defendant's intent when he encountered K.M.

Over defendant's objection, the trial court concluded that the proposed testimony satisfied each prong of the Cofield[1] analysis. The court found that N.J.'s testimony was relevant, and that the acts alleged by N.J. were similar in kind and reasonably close in time to the incident involving K.M. The court found N.J. credible and that the probative value of her testimony outweighed any prejudice to defendant. Brushing aside defendant's concern that the evidence would also bolster K.M.'s

---

[1] State v. Cofield, 127 N.J. 328, 338 (1992).

4

shaky identification of defendant, the trial court noted that a limiting instruction would restrict the jury's consideration of the evidence.

The following evidence was adduced at the trial that commenced on May 13, 2008.

In April 2006, K.M. was twenty-two years old. She lived with her family in North Plainfield. She attended a methadone clinic but still used heroin occasionally and crack cocaine regularly. K.M. earned the money to support her drug habit as a prostitute.

K.M. testified that on April 25, 2006, around 3:30 p.m., she walked from her home in North Plainfield to Plainfield to buy crack. She paid for the drugs with money she had earned by performing sexual services for several men that day. She could not recall the particular services she provided or the number of men with whom she had sex, but K.M. testified that she was sure the number of customers was "between one and five." K.M. purchased crack, smoked "[a] little" of it, and also ingested some methadone and Xanax that day.

At approximately 10:00 p.m. that evening, K.M. was walking home alone from Plainfield to North Plainfield, when a passing vehicle that looked "like a black Navigator" pulled over next to her. K.M. approached the vehicle thinking that the driver was her friend "Pookie," whom she knew from the methadone clinic she

5

attended.  As K.M. approached the open car window, the driver asked her if she was working.  K.M. replied that she was not, but inquired if the driver was Pookie.  When the driver replied, "Yeah.  Don't I know you?" and asked, "Do you want a ride home?", K.M. entered the vehicle in order "to buy some heroin off of [the driver]."

According to K.M., she realized as she entered the front seat that the driver was not Pookie, but she remained in the car after the driver informed her that his name was Terrance and reiterated his offer to drive her home.  K.M. agreed, and directed the driver to turn left.  The driver, however, turned right.

K.M. recalled the driver saying that he was just going to talk and take her home.  The driver asked K.M. if she did any drugs, and K.M. told him that she smoked crack.  He then asked K.M. for sexual favors in exchange for crack.  K.M. refused.  K.M. recounted that the driver continued to drive around, and at that point, K.M. "had a feeling that something bad was going to happen."

The driver drove to a poorly lit residential area, made a u-turn, parked, and turned off the engine.  He grabbed K.M.'s hand, took her cigarette out of her mouth, and burned her wrist with it.  K.M. started to scream and pull away, but the driver took her head and put it into his lap.  K.M. testified that the

6

driver's penis was out of his pants, although she did not see him take it out. She could see that he was not wearing a condom.[2] When the driver shoved K.M.'s head into his lap, she kept her mouth closed and grabbed his testicles and twisted them, hoping the driver would release her. The driver let go of K.M. and she sat up. The driver hit K.M.'s face with an open hand, causing her to hit her head against the front passenger window.

K.M. testified that she then realized that she was about to be raped. The driver climbed on top of her and pulled her pants and underwear down in spite of her resistance. K.M. tried to fight the driver off, but he put his penis inside her, causing her to cry. The driver also lifted K.M.'s shirt and kissed her breasts. When he rolled off her and pulled his pants up, K.M. adjusted her clothing and left the car as quickly as possible, leaving her purse in the car. As the driver drove away, K.M. screamed "rape," and yelled towards the driver, "Hey, asshole, you got my pocketbook, you are going to get caught."

K.M.'s screams attracted the attention of a nearby resident, who called the police. Before the police arrived, K.M. threw away about $20 worth of crack. The police arrived within three to five minutes after K.M. left the driver's car.

---

[2] K.M. testified that she insisted her customers use condoms and carried a supply of condoms with her at all times.

Officer Craig Kennovin of the Plainfield Police Department testified that he found K.M. alone at the intersection of Johnson Avenue and George Street.  K.M. was crying and appeared to be "pretty upset."  Officer Kennovin took her to Muhlenberg Hospital, but the hospital could not conduct a rape kit examination on K.M. that evening because she was too high from the drugs she had taken to give consent to the examination.  While they were at the hospital, Officer Kennovin received a call from another officer that K.M.'s purse had been found.  The purse was returned to K.M. before she left the hospital.  It contained a wallet without any money and several condoms.

At 2:00 p.m. the following day, a Sexual Assault Nurse Examiner conducted a rape kit examination of K.M.  The nurse prepared slides to test for bodily fluids and observed injuries and bruises on the back of K.M.'s neck and thigh and burn marks on her wrist.  The nurse also observed a cut on the inside of K.M.'s mouth and that her face was slightly swollen.

A few days after the examination, K.M. spoke with a Plainfield Police Department detective.  During this interview, K.M. denied that she worked as a prostitute.  At trial, K.M. stated that her parents attended the interview and that she had denied working as a prostitute because of their presence, but the detective testified that K.M.'s parents were not present.

8

K.M. also did not tell the detective that Pookie was a drug dealer, but admitted that she had taken drugs that night.

K.M. described the driver as "fat," "dark complected," with "braids or curly hair," and a beard. She estimated his age as between twenty-nine and thirty-seven.

Almost a year after the alleged sexual assault, the detective who had interviewed K.M. obtained a photograph of defendant and prepared a six-photo photographic array. Although K.M. was unable to definitively identify defendant from the photos, she asked to see photo number three -- defendant's photo -- a second time because he looked familiar. K.M. told the detective that she was trying to imagine what the man depicted in photo number three "looked like with braids." She also told the detective that she could not be one hundred percent sure whether photo three depicted her assailant because "it happened a while ago, she was high, and it was dark outside, poor light."

The detective obtained a court order for defendant's DNA, and buccal swabs from defendant were sent to the State Police Laboratory. Defendant's DNA was a match for the DNA found in the semen on the vaginal swab obtained from K.M. Based on that information, an arrest warrant was issued, and defendant was arrested on May 16, 2007. At the time of defendant's arrest, he was forty-four years old, weighed 260 pounds, and had facial

hair described by the investigating detective as a "goatee mustache sort of thing[.]"

Following the testimony of K.M., the responding police officers, and the nurse who conducted the sexual assault examination of K.M., the State presented the testimony of N.J. regarding a 2003 attempted sexual assault of her, which the trial court concluded was admissible as other-crime evidence pursuant to N.J.R.E. 404(b). N.J. testified that on May 9, 2003, she was in Plainfield visiting her grandmother with her friend, Michelle. After the visit, at approximately 6:00 p.m., N.J. and Michelle returned to Michelle's car, but the car did not start. They walked to a mechanic's garage but discovered that it was closed. The two women attempted to find someone who could help fix the car or give them a ride to Piscataway. Michelle went inside a store, while N.J. stood outside. At some point, N.J. left the area with another friend, Scoop. As they were walking, a passerby blew his horn and pulled over. Although N.J. did not know the driver by name, she recognized him from the neighborhood. The driver told N.J. that his name was "Xavier." After he agreed to drive N.J. to her sister's house, N.J. entered his car. N.J. asked the driver what he was doing and he replied, "I'm out doing the devil's work."

Soon after, N.J. noticed that the driver was driving in the wrong direction and she asked him why he did not make the

correct turn. The driver replied that he had to stop by his apartment. He eventually drove into a parking lot of an apartment complex and parked his car. The driver jumped over and started choking N.J., who was seated in the front passenger seat. N.J. tried to scream. The driver told her to "[s]hut up" and "[t]ake [her] pants down." The driver unbuttoned N.J.'s pants but N.J. resisted. The driver then pulled up N.J.'s shirt and touched her as he continued choking her with one hand.

At this point, N.J. begged the driver to let her "come up for air," and stated, "If you let me get in the back, I can get some air." N.J. climbed into the back seat, unlocked the car door, and escaped. As N.J. was leaving the car, a baseball bat and some CDs fell out of the car, which she picked up and threw back into the car. The driver then sped off.

N.J. testified that, soon thereafter, she encountered several of her husband's friends and described the man and his vehicle. They responded that they knew the driver and would find him. N.J. and the men got into a car and drove to Sixth Street in Plainfield. While they were in the car, they also called 9-1-1. Meanwhile, N.J. flagged down a passing police car. While N.J. was speaking to the police, she saw a vehicle driven by her assailant and identified the driver to the police.

The officers who encountered N.J. following the attempted assault also testified at trial. According to one of the

11

officers, N.J. pointed to a passing vehicle and said, "That's the guy, that's the guy." The officer and his partner pursued and stopped the assailant's vehicle. Defendant was the driver of the vehicle.

Meanwhile, another officer took a detailed statement from N.J. She described her assailant, as well as the items in his car. After the interview, the officer placed N.J. in his patrol car, drove to the place where the other officers had stopped defendant, and approached defendant. The officer testified that defendant matched the description provided by N.J. He also observed the items described by N.J. in the backseat of defendant's car. The officer testified that N.J. later identified defendant as her assailant.

Although defendant was arrested for attempted sexual assault, N.J. testified that she never heard from anyone from the Prosecutor's Office thereafter. She explained that she had moved several times within New Jersey during that time, but had given her cell phone number to the police. She thought that the authorities had not believed her and decided not to pursue the case.

Following N.J.'s testimony, the trial court instructed the jury that the evidence of the attempted sexual assault against N.J. was admitted "solely to show that the defendant had the intent to commit a sexual assault upon [K.M.]" The trial court

12

also informed the jury that it could not use N.J.'s testimony to conclude that defendant has a tendency to commit crimes or that he is a bad person. The trial court reiterated that the evidence had been admitted "only to help [the jury] decide the specific question as to whether the defendant had a specific intent to sexually assault [K.M.]"

In the final charge to the jury, the trial court reiterated that the evidence presented by N.J. regarding the May 2003 attempted sexual assault was admitted "solely to show the intent of the defendant to commit a sexual assault against [K.M.]" The trial court also informed the jury that it could not use the evidence advanced by N.J. to conclude that defendant had a tendency to commit criminal acts. The trial court, however, also informed the jury that the identification of defendant as the person who sexually assaulted K.M. was a disputed issue in the trial and referred to N.J.'s testimony and her identification of defendant as her assailant in May 2003. The trial court stated:

> The defendant as part of his general denial of guilt contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that he is the person who committed the alleged offense.
>
> . . . .
>
> Now the State has presented evidence . . . of [K.M.] concerning the April 25th incident in '06 and [N.J.] for a different purpose but

13

identification of the assault that occurred -- allegedly occurred on the 9th of May, 2003.

Now you will recall that these witnesses identified the defendant -- [N.J.] identified the defendant[;] [K.M.]'s identification was uncertain as the person who committed the offense.

. . . .

Now, according to the witnesses, their identifications of the defendant w[ere] based upon the observations and perception[s] that they made of the perpetrator at the time the offense was being committed.

It is your function to determine whether the witnesses' identification of the defendant is reliable and believable or whether it is based on any mistake or for any other reason which is not worthy of belief. You must consider whether it is sufficiently reliable evidence upon which to conclude that this defendant is the person who committed the offense charged.

The jury found defendant guilty of third-degree criminal restraint, second-degree sexual assault, and the disorderly persons offense of simple assault. The trial court imposed a ten-year term of incarceration with an eighty-five percent parole disqualifier for the sexual assault conviction and a consecutive four-year term for the criminal restraint charge. The court also imposed a concurrent term of six months' incarceration for the simple assault conviction.

II.

14

In an unreported opinion, the Appellate Division affirmed defendant's conviction but remanded for reconsideration of his sentence. The appellate panel rejected defendant's argument that the trial court should have excluded N.J.'s testimony of the May 2003 attempted sexual assault. The panel concluded that defendant's intent was a material issue, that the circumstances of the assaults experienced by K.M. and N.J. were similar, that the three-year interval between the incidents was reasonably close in time, that the evidence provided by N.J. was probative of defendant's intent regarding K.M., and that "the events described by N.J. were no more inflammatory than the events described by K.M." The Appellate Division also dismissed defendant's challenge to the identification charge delivered by the trial court. In doing so, the panel remarked that identity was not at issue in the trial.

We granted defendant's petition for certification. State v. Willis, 218 N.J. 532 (2014).

### III.

### A.

The admission or exclusion of evidence at trial rests in the sound discretion of the trial court. State v. Gillispie, 208 N.J. 59, 84 (2011). That discretion is not unbounded. Rather, it is guided by legal principles governing the admissibility of evidence which have been crafted to assure that

15

jurors receive relevant and reliable evidence to permit them to perform their fact-finding function and that all parties receive a fair trial.  See N.J.R.E. 102 (stating that New Jersey's rules of evidence are meant to "secure fairness in administration and elimination of unjustified expense and delay" and permit development of law "to the end that the truth may be ascertained and proceedings justly determined").

This appeal focuses on the admission of other-crime evidence -- specifically, the admission of a prior uncharged act of attempted sexual assault against a young woman who identified defendant as her assailant.  N.J.R.E. 404(b) governs the admissibility of such evidence.

N.J.R.E. 404(b) provides:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith.  Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

Because evidence of a defendant's previous misconduct "has a unique tendency" to prejudice a jury, it must be admitted with caution.  State v. Reddish, 181 N.J. 553, 608 (2004) (internal citation omitted); see also State v. Stevens, 115 N.J. 289, 302 (1989) ("There is widespread agreement that other-crime evidence has a unique tendency to turn a jury against the defendant.").

16

Prior-conduct evidence has the effect of suggesting to a jury that a defendant has a propensity to commit crimes, and, therefore, that it is "more probable that he committed the crime for which he is on trial." State v. Weeks, 107 N.J. 396, 406 (1987) (citation omitted).

With those principles in mind, this Court, in Cofield, supra, established a four-prong test designed "to avoid the over-use of extrinsic evidence of other crimes or wrongs" pursuant to a 404(b) exception. 127 N.J. at 338. The Cofield test requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid.]

In this appeal, our review of the admission of the uncharged 2003 prior sexual assault of N.J. focuses on prongs one and four.

The first prong requires that "the evidence of the prior bad act, crime, or wrong . . . be relevant to a material issue that is genuinely disputed." State v. Covell, 157 N.J. 554, 564-65 (1999). Under N.J.R.E. 401, evidence is relevant if it

17

"[has] a tendency in reason to prove or disprove any fact of consequence to the determination of the action." In Covell, supra, this Court noted that the primary focus in determining the relevance of evidence is whether there is a "logical connection between the proffered evidence and a fact in issue." 157 N.J. at 565 (internal quotation marks omitted). Moreover, the material fact sought to be proved must be one that is actually in dispute, Cofield, supra, 127 N.J. at 338, and cannot merely be offered to indicate that because the defendant is disposed toward wrongful acts generally, he is probably guilty of the present act, see State v. Nance, 148 N.J. 376, 386 (1997).

In State v. Oliver, 133 N.J. 141, 155 (1993), the Court addressed the use of other-crime evidence in sexual assault cases in which the victim's consent is a genuine and material issue. The Court reasoned that "[w]hen a defendant claims that he penetrated with permission, he puts his own state of mind in issue: he argues that he reasonably believed that the alleged victim had affirmatively and freely given him permission to penetrate." Ibid. Therefore, when a defendant claims the victim consented, the State may "introduce evidence to disprove that the defendant had that state of mind." Ibid. Importantly, the Court recognized that evidence of prior similar bad acts to show present state of mind have the clear capacity to cause

18

undue prejudice to a defendant.  Id. at 156.  Therefore, although the Court recognized that a prior similar bad act may be admissible, the Court instructed the trial court in that case to "limit the use of other-crimes evidence to showing only the feasibility of the [sexual assaults in the defendant's third floor room] and the defendant's use of pretext."  Ibid.

Tellingly, even in the cases in which the Court found that the trial court properly admitted other-crime evidence to prove the intent or state of mind of a defendant charged with sexual assault, see, e.g., Stevens, supra, 115 N.J. at 293, 305 (holding that testimony containing evidence of defendant's prior uncharged solicitations of sexual favors and similar sexual misconduct involving other women, committed while defendant was acting as police officer, was admissible to prove his purpose of receiving sexual gratification when ordering two different women to disrobe during routine investigations), this Court has repeatedly emphasized that other-crime evidence must be relevant to a genuinely contested fact and that the probative value of the proffered evidence must be critically evaluated in order to properly balance the relevance of the evidence and the prejudice its admission will cause, id. at 302.

The fourth Cofield prong requires that the "probative value of the evidence must not be outweighed by its apparent prejudice."  127 N.J. at 338.  The fourth prong recognizes that

19

the "inflammatory characteristic of other-crime evidence . . . mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." Stevens, supra, 115 N.J. at 303. When analyzing prejudice under N.J.R.E. 404(b), courts should also consider the factors presented in N.J.R.E. 403, which states that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis added). However, because "[o]ther-crimes evidence . . . necessitates a more searching inquiry than that required by N.J.R.E. 403," "the potential for undue prejudice need only outweigh probative value to warrant exclusion" of other-crime evidence. Reddish, supra, 181 N.J. at 608 (citation omitted). Thus, courts have interpreted N.J.R.E. 404(b) "as a rule of exclusion rather than a rule of inclusion." State v. Marrero, 148 N.J. 469, 483 (1997) (citing Cofield, supra, 127 N.J. at 337-38).

"[T]he party seeking to admit other-crimes evidence bears the burden of establishing that the probative value of the evidence is not outweighed by its apparent prejudice." Reddish,

supra, 181 N.J. at 608-09.  Ultimately, if the party seeking to admit the evidence "demonstrate[s] the necessity of the other-crime evidence to prove a genuine fact in issue and the court has carefully balanced the probative value of the evidence against the possible undue prejudice it may create, the court must instruct the jury on the limited use of the evidence." Cofield, supra, 127 N.J. at 340-41 (citation omitted).

IV.

The central issue in this case was not whether defendant and K.M. had sexual relations on the evening of April 25, 2006. The issue was whether the sexual relations were consensual.  The N.J.R.E. 404(b) evidence permitted by the trial court concerned evidence presented by N.J., who testified that defendant attempted to sexually assault her in May 2003.  Defendant had been arrested but never indicted for that incident.

We acknowledge that the assaults of K.M. and N.J. had certain common elements.  Great care must be taken, however, whenever evidence of prior sexual assaults are introduced purportedly to illuminate a defendant's state of mind to assure that such evidence cannot be used, even inadvertently, by a jury as evidence of a propensity to commit criminal acts.  To that end, the logical connection between the prior bad act and the contested issue must be clear and strong.  Here, the logical relationship between N.J.'s encounter with defendant three years

21

before the assault of K.M. is marginal at best.  Furthermore, the admission of evidence of the 2003 uncharged sexual assault caused undue prejudice to defendant.  Indeed, as presented in this case, the prejudice attendant to this evidence overwhelmed its marginal probative value.

The trial proceeded over five days.  The first day of trial consisted of jury selection and opening statements.  The second day of trial consisted of the testimony of K.M., the man who heard K.M.'s screams and called the police, the police officer who responded to the call for police assistance, the nurse who examined K.M. at the hospital, and the detective who interviewed K.M.  The third day of trial was an abbreviated session[3] consisting solely of the testimony of the forensic scientist at the State Police Laboratory, who testified about the DNA analysis that established that defendant was the source of the semen found inside K.M.  The fourth day of trial consisted of the testimony of N.J. and two of the Plainfield officers who assisted her and detained defendant in April 2003.  In other words, the other-crime evidence permitted in this trial consumed almost as much time as the evidence of the State's case-in-chief.  The State's presentation of the other-crime evidence

---

[3] The transcript of the State Police forensic scientist covers less than thirty-nine pages.  Defense counsel did not cross-examine this witness.

22

also appears to have proceeded on the premise that it was required to submit clear and convincing evidence of that prior uncharged criminal act. In a very real sense, N.J.'s other-crime evidence became a trial on N.J.'s allegation of attempted sexual assault by defendant within the trial of K.M.'s sexual assault.

We emphasize that N.J.R.E. 404(b) is at base a rule of exclusion. Marrero, supra, 148 N.J. at 483. Moreover, when other-crime evidence is admitted, it must be proportionate to the limited purpose for which it is admitted. The demonstration of clear and convincing proof only relates to the admissibility of the evidence and that is a threshold inquiry for the trial court. In other words, while the State is free to introduce substantial corroborating evidence to establish that a prior event occurred at a Rule 104 hearing, the other-crime evidence introduced at trial must not be allowed to overwhelm the matter at hand.

Here, the testimony from the two police officers involved in N.J.'s case may have been useful to establish that N.J.'s assault occurred in order to inform the trial court's decision to admit or exclude N.J.'s testimony. However, the amount of other-crime evidence produced at trial for the ostensible purpose of discerning defendant's intent on April 25, 2006, compared to the amount of evidence produced by the State in its

case-in-chief, was so disproportionate that it had the clear capacity to distract the jury's attention from the case-in-chief and overwhelm any effort to cabin the jury's consideration of the limited role this evidence had at trial. Moreover, the testimony of the assisting police officers effectively corroborated N.J.'s identification of defendant as her assailant, and the outsized role of N.J.'s purportedly limited testimony was compounded by the trial court's instruction on the issue of identification. Contrary to its ruling on the admissibility of N.J.'s other-crime evidence and the limiting instruction provided to the jury, the trial court invited the jury to consider the fact that N.J. also identified defendant as her assailant and that her description of her assailant was markedly similar to the description provided by K.M. of her assailant. At that point, defense counsel's fear that N.J.'s testimony would be used to bolster K.M.'s shaky identification became a reality.

The marginal relevance of a three-year-old attempted sexual assault against N.J. could not overcome the manifest prejudice of that evidence. It should not have been admitted. The error was compounded by the quality and quantity of the other-crime evidence introduced at trial that could have been interpreted by the jury only as evidence that defendant had a propensity to

commit sexual offenses against young women he encountered on the street.

This appeal illustrates the restraint that must be exercised in the admission of other-crime evidence in sexual assault cases. It underscores the observation of this Court in Oliver, supra, that "evidence of past acts to show present state of mind raises problems . . . under [N.J.R.E. 403] because the prejudice to defendant seemingly far outweighs the limited probative quality of that evidence." 133 N.J. at 156. This is one of those cases where the unrestrained use of evidence of another marginally relevant and arguably remote-in-time sexual assault had so clear a capacity to distract the jury from the evidence in support of the State's case-in-chief that it should have been excluded.

V.

The judgment of the Appellate Division is reversed.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON and SOLOMON join in JUDGE CUFF's opinion. JUSTICE FERNANDEZ-VINA did not participate.

# SUPREME COURT OF NEW JERSEY

NO.    A-115                          SEPTEMBER TERM 2013

ON CERTIFICATION TO     Appellate Division, Superior Court

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

          v.

RICHARD WILLIS (a/k/a RICHARD
DWAYNE WILLIS, RICHARD DWAYNE
WILUS),

      Defendant-Appellant.

DECIDED          May 11, 2016
         Chief Justice Rabner          PRESIDING

OPINION BY          Judge Cuff (temporarily assigned)

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY

| CHECKLIST | REVERSE | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | ------------------ | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |