**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3772-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ROBERT WARREN,

     Defendant-Appellant.

_____

Argued September 23, 2019 – Decided  December 20. 2019

Before Judges Fasciale, Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 14-09-1558.

Elizabeth Cheryl Jarit, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Elizabeth Cheryl Jarit of counsel and on the brief).

Erin M. Campbell, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Alanna M. Jereb on the briefs).

Appellant filed a pro se supplemental brief

PER CURIAM

Defendant Robert Warren appeals his conviction by jury of first-degree carjacking, N.J.S.A. 2C:15-2 (count one); second-degree burglary, N.J.S.A. 2C:18-2 (count three); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count four); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); and three counts of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (counts six, seven and nine), and his concomitant sentence.[1]  In his merits brief, he argues:

> POINT I
>
> THE ADMISSION OF EXPERT TESTIMONY WHEN NOTICE WAS NOT PROVIDED BY THE STATE UNTIL MID-WAY THROUGH TRIAL, AND WHERE NO REPORT OR SUMMARY OF THE PROPOSED TESTIMONY WAS EVER PROVIDED, DEPRIVED [DEFENDANT] OF DUE PROCESS, A FAIR TRIAL, AND THE OPPORTUNITY TO CONFRONT THE WITNESS AGAINST HIM.
>
> POINT II
>
> THE OFFICER'S OPINION TESTIMONY THAT HE BELIEVED [DEFENDANT'S] CAR MATCHED THAT DRIVEN BY ONE OF THE SUSPECTS

---

[1]  Defendant was found not guilty of first-degree robbery, N.J.S.A. 2C:15-1 (count two).  "The trial court granted defendant's motion for acquittal of one of the third-degree aggravated assault charges, N.J.S.A. 2C:12-1(b)(2) (count eight)."  The court merged defendant's conviction for second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five).

VIOLATED N.J.R.E. 701 AND STATE V. MCLEAN, AND DEPRIVED [DEFENDANT] OF DUE PROCESS AND A FAIR TRIAL.

POINT III

[DEFENDANT]'S CONVICTION MUST BE REVERSED BECAUSE ALTHOUGH SEVERAL OF THE CHARGES WERE BASED ON A THEORY OF ATTEMPT, ATTEMPT WAS NEVER CORRECTLY DEFINED FOR THE JURY.

A. Failure to instruct the jury on the law of attempt concerning the carjacking charge requires reversal.

B. Because the court instructed the jury on the wrong theory of attempt on three counts of aggravated assault, reversal is required.

POINT IV

THE COURT'S IMPROPER CONSIDERATION OF [DEFENDANT]'S "REFUSAL" TO ADMIT GUILT, AND THE IMPOSITION OF DISPARATE SENTENCES, REQUIRE RESENTENCING.

A. Consideration of the defendant's failure to admit guilt in finding aggravating factor three violates [defendant]'s rights to remain silent and maintain his innocence, and contravenes the requirement that the State prove his guilt before a jury.

B. [Defendant]'s twenty-year sentence for carjacking is disparate with the fifteen-year sentence imposed on his codefendant, requiring resentencing.

3 <span>A-3772-16T4</span>

In a pro se supplemental letter brief he adds:

> POINT [I]
>
> THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO CLARIFY THAT A CHARGE OF CARJACKING REQUIRES AN INTENT TO STEAL THE CAR WHEN THE JURY SPECIFICALLY ASKED FOR CLARIFICATION OF THAT POINT OVER DEFENSE OBJECTION[.]
>
> POINT [II]
>
> THE CUMULATIVE ERRORS DEPRIVED [DEFENDANT] A FAIR TRIAL[.]

Recognizing that "trial courts are vested with the discretion to fashion an appropriate sanction for a violation of discovery obligations," State v. Richardson, 452 N.J. Super. 124, 137 (2017) (citing State v. Dabas, 215 N.J. 114, 141 (2013)), we determine the trial court abused its discretion in allowing the State's fingerprint expert to testify and reverse.

The State alleged three of a group of men who were watching television in a North Bergen apartment left to get food. When they returned, codefendant Gregory Eady,[2]—who had earlier approached the three men at a Quik Mart— and defendant accosted one of three men and forced him at gunpoint into the

---

[2] Eady pleaded guilty to three counts and was sentenced to an aggregate fifteen-year State prison sentence, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2

A-3772-16T4

apartment where others in the group had remained. Some of the group fled. During the ensuing moments, defendants concertedly held the remaining men in the apartment at gunpoint, threatened to kill them if they did not reveal the location of money and marijuana, ransacked the apartment looking for same and, finding none, ripped a gold chain from a victim's neck. Thereafter, Eady and defendant saw one of the men who had fled the apartment looking in the apartment window. When they followed him outside, they came upon another of the men who had fled, chased him to his car and ordered him out of the car at gunpoint. The man accelerated and was able to shed defendant and Eady sequentially as they tried to enter his vehicle from opposite sides. They shot at him as he fled.

A detective who later processed the vehicle testified he lifted nine latent fingerprints. The State's fingerprint expert, Irene Williams, testified that two of the latent prints—one on the exterior passenger side and the other on the interior glass edge of a passenger-side window—matched defendant's fingerprints.

During argument outside the jury's presence on October 13, 2015—the third day of testimony—defendant's counsel objected to the impending testimony of the State's fingerprint expert. Defendant's counsel recounted that

5

on September 25, 2015,[3] the day of the trial call, the State provided a request for latent fingerprint examination form.[4] Defendant's counsel conceded that she had previously received in discovery

> a report that was prepared by a police officer that indicated what the findings were. However, there was no comparison or any information such as that put in his report. And, for the record, that would be, I believe, Officer Vasquez's report. That would be Report Number 13. That is what was . . . provided in discovery. This other documentation was provided on September 25[].

She later explained the report provided in discovery "says that those . . . fingerprints came back to [defendant]" which the trial court clarified to mean "that AFIS[5] had identified [defendant] as one of the fingerprint matches[.]"

During the ensuing colloquy with the trial court and assistant prosecutor,

---

[3]  A footnote in defendant's merits brief reasserts that defense counsel did not receive the latent fingerprint examination until September 25, 2015. The trial court, however, found that the report was handed over September 21, 2015. The discrepancy does not affect our review.

[4]  Counsel later said, "on September 25[] the State gave two documents call[ed] requests for latent fingerprint examination and this document, request for latent fingerprint examination, the State gave that in [c]ourt on September 25[]." Only one request for latent fingerprint examination form was included in appellant's appendix. We see no mention in the record or the parties' briefs of a second report.

[5]  AFIS is an acronym for the New Jersey State Police Automated Fingerprint Identification System.

defense counsel protested that "Officer Vasquez only prepared a report -- a five[-]line report . . . he says he confirmed this information," and that "Officer Vasquez never submitted anything in writing as to the test that he performed."

The assistant prosecutor retorted that "[t]he State was prepared to offer the testimony . . . of Detective Mendez[,] not Vasquez . . . [and] [t]hat [defense counsel] mistakenly identified as . . . the individual who verified the comparison that was conducted by the AFIS unit." The assistant prosecutor explained:

> What I mean by that is that there's three . . . steps in the process. You have an initial individual who reviews the . . . latent fingerprint and . . . compares it to the inked fingerprint. You have a second individual who is Irene Williams, whose initials are on these documents, who then does her own analysis to either confirm, verify, or deny the fact that they were these . . . number of points.
>
> This evidence here, Your Honor, which I'm pointing to, which is the request for latent fingerprint examination, was provided to defense counsel on September [21] and I have an evidence receipt for it. So she was not surprised during the trial. This has been with her since then.
>
> And what Ms. Williams will testify here to today in . . . terms of what did she do with the comparison, the analysis that . . . took place. And she, once she's done, then . . . the packet comes back to North Bergen, which is where Detective Mendez did what he did. Reviewed it and verified the . . . results.

He didn't have an additional report. He based his findings on the reports from AFIS.

From defense counsel's recollection that during the week prior, she said she would "not consent to anyone other than the actual person coming in here to testify," and from the trial court's direction to "the State to get somebody from AFIS to come here and testify," we deduce the defense objection was based on the fact that Mendez relied on the AFIS comparison and did not compare defendant's prints to any known prints, but based his findings on "reports from AFIS."[6] As defense counsel represented, Mendez's short report contained "no comparison or any information such as that."

The State, instead of calling Mendez, forwarded defense counsel Williams's resume on Friday, October 9, 2015. Defendant's counsel objected to Williams being called as an expert witness because counsel had "no reports, conclusions, or findings from this witness." Williams admitted during trial that her office does not "do written reports" which she said were "the responsibility of the police department" that submitted the fingerprints for analysis.

The trial court examined the request for latent fingerprint examination form, confirmed that Williams's initials appeared at the bottom of the form as a

---

[6] We note neither party included Mendez's report in the record.

person who conducted the comparison and found the fingerprints of the person who was linked to defendant's SBI number[7] matched items six and nine on the report, "[fifty] points on one, [twenty-nine] on the other." The trial court concluded, although the "report"—the trial court's term for the request for latent fingerprint examination form—was not turned over until September 21, "there was not even an issue raised [as] to [its] lateness," and that the "issue was whether or not the defense was on sufficient notice as to what [Mendez] based his findings on." The court also found "the State had represented . . . they could call someone from AFIS" instead of Mendez "because the defense has the report" which the court believed contained "a discussion as to the number of matches -- points of comparison." The court's finding that the State opened on the previous Wednesday, October 7, 2015, that defendant's "fingerprints were found in the vehicle," led the court to conclude:

> [C]learly the defense was on notice that fingerprints were a critical issue in this case. We received two weeks prior to trial the report from the State Police matching it to [defendant]. Defense certainly has had ample opportunity if they felt the need to request an adjournment or . . . certainly to get their own expert. I mean, certainly from the inception of this case the defense was in possession of documentation indicating AFIS had done a positive match.

---

[7] SBI is an acronym for State Bureau of Identification.

9

I don't find there's been any unfair surprise and there's no prejudice to the defense by the report being turned over fourteen days in advance of trial, instead of thirty. The information was in . . . the possession of the defense well in advance of the trial date.

Rule 3:13-3(b)(1)(I) requires the State to provide discovery of the

names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. Except as otherwise provided in R. 3:10-3, if this information is not furnished 30 days in advance of trial, the expert witness may, upon application by the defendant, be barred from testifying at trial.

It is abundantly clear from the record that Williams never prepared a report that complied with the Rule, an objection lodged early and often by defendant's counsel. Indeed, in the sidebar that took place on October 8, 2015, during the testimony of the detective who lifted the latent prints, the assistant prosecutor admitted State Police personnel told him they do not testify. The State, therefore, planned to call Mendez. The assistant prosecutor explained:

So, [Mendez] from the North Bergen Police Department is going to be testifying as to his verification on . . . these results. So, two different people had the State Police examine the fingerprints.

10

> First round is in Totowa. The second round is in Ewing. Once they obtain the match they send it back to the municipality for the local [police department] to do the verification of fingerprints. They . . . review it. They determine whether or not there's a match. And that's why I'm offering him as the expert to testify.

When the assistant prosecutor said Mendez did "his own independent comparison," defendant's counsel protested that the State "never gave anything that you're calling anybody as an expert." The trial court ended the discussion by simply directing cross-examination of the detective on the stand resume.

The discussion resumed on the next trial day, five days later. Defendant's counsel renewed her objection after Williams was revealed as the State's expert, explaining

> [t]here's nothing for me to cross-examine on, because there's no reports. What [I did] receive is the AFIS hit back on September 21[], which indicates . . . how many points were done. There's . . . [n]o report that says this is what was done. This is how it was analyzed or anything.

Because counsel had "nothing from her, except something with I.W. written on the bottom," counsel requested a N.J.R.E. 104 hearing to inquire of Williams, before she testified, if she did "any independent review of the raw data and what her conclusions were."

After the trial court declined that request, Williams testified to much more than was in the request for latent fingerprint examination. The expert first explained the first stage of her process—minutiae plotting—where each latent print submitted by the agency for analysis is examined under a magnifying glass to ensure that it is suitable for entry into the AFIS system. At least ten characteristics or points that distinguish one fingerprint from another—bifurcations, dots, short ridges and enclosures—must be identified in order for a print to be suitable for entry. Once identified, the points are plotted on the scanned latent print.

Williams explained once the suitable print was entered into the AFIS database,

> it goes through a system called matching. And what these matchers do, based on algorithms . . . it will take into consideration the placement of those minutiae points that we plotted, and it will go through hundreds of thousands of possible matches, and it'll give us twenty-five, possible, for each lift that we enter.

The next step, described by Williams as the verification part, entails the expert, "manually[—]with [his or her] eye and [a] magnifying glass"—to compare the identified points on the print returned by AFIS, which is attended by an assigned SBI number, to points in the same location on the latent print until at least ten matches are found. She continued, a card in "another system

12

called FARS" associated with the SBI number is printed; the expert then "highlight[s] the [f]inger [n]umber that we hit on."

Williams testified that she rechecks the work of her subordinates who initially review the prints, "whether it's a hit or not," and verifies their work. On cross-examination, she said she reviewed only those lifts and candidate prints that her subordinate said matched.

On direct examination, she reviewed the two latent prints lifted from the victim's vehicle and compared them to the print the computer program identified as one of the twenty-five possible candidates, narrowed by the finger number linked to the SBI number. She reviewed each of the points on each of the two latent prints and candidate prints shown side-by-side, describing to the jury each short ridge, ending ridge, enclosure and bifurcation she said matched. Based on those comparisons, she opined each of the latent prints matched defendant's known prints.

In considering whether the trial court abused its discretion in allowing Williams to testify and refusing defense counsel's entreaty to examine the expert during a preliminary hearing, N.J.R.E. 104, we review the "[f]actors that should result in permitting the expert to testify[,] includ[ing] '(1) the absence of any design to mislead, (2) the absence of the element of surprise if the evidence is

13

admitted and (3) the absence of prejudice which would result from the admission of evidence.'" State v. Washington, 453 N.J. Super. 164, 191 (App. Div. 2018) (first alteration in original) (quoting State v. LaBrutto, 114 N.J. 187, 205 (1989)).

We do not agree with the trial court that discovery provided to defendant obviated any surprise because it revealed defendant's prints were matched to those lifted from the victim's vehicle, and that defendant had enough time to retain his own expert. Nothing in the record demonstrates that the discovery provided anything except a conclusion regarding the matched prints. As the trial court found, the discovery revealed "AFIS had identified [defendant] as one of the fingerprint matches." Nothing provided in discovery, however, contained the basis for that conclusion. The methods employed in comparing the prints, as testified by Williams, were not included in the discovery.

We have consistently recognized the importance of providing an expert's analysis to the defense in advance of trial. In State v. Berezansky, we determined the State's failure to provide the defendant with the laboratory analysis in connection with a blood alcohol test deprived the defendant an adequate opportunity to challenge the results. 386 N.J. Super. 84, 94-95 (App. Div. 2006). In State v. Heisler, construing the notice and demand provisions of

N.J.S.A. 2C:35-19,[8] we ruled the time period for a defendant to object to a State-proffered notice of intent (NOI) to offer into evidence a laboratory certificate regarding the quantity and quality of drugs, runs not from the date the State tenders the NOI, but from the date it provides the data supporting the NOI. 422 N.J. Super. 399, 422 (App. Div. 2011). We observed, "if the defendant is unable to determine, because of the absence of laboratory data, whether there is a basis to wage a 'true contest' over the nature of the substance, then the defendant may lodge a protective objection," noting the Legislature's goals in enacting the statute, including enabling "defendants to make informed decisions regarding whether to object," id. at 416-17, would be undermined by such a practice, id. at 422. And we have prohibited the use of net opinions, those without the whys and wherefores of the expert's conclusion. Quail v. Shop-Rite Supermarkets,

---

[8] N.J.S.A. 2C:35-19(c) states:

> Whenever a party intends to proffer in a criminal or quasi-criminal proceeding, a certificate executed pursuant to this section, notice of an intent to proffer that certificate and all reports relating to the analysis in question, including a copy of the certificate, shall be conveyed to the opposing party or parties at least 20 days before the proceeding begins. An opposing party who intends to object to the admission into evidence of a certificate shall give notice of objection and the grounds for the objection within 10 days upon receiving the adversary's notice of intent to proffer the certificate.

A-3772-16T4

Inc., 455 N.J. Super. 118, 132 (App. Div. 2018) ("The doctrine barring the admission at trial of net opinions is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" (alterations in original) (quoting Townsend v. Pierre, 221 N.J. 36, 53-54 (2015))).

We note defense counsel conceded Detective Mendez's report, included with timely-provided discovery, disclosed that "fingerprints came back to" defendant, and that the request for latent fingerprint examination form, not provided until September 21, 2015, listed eight item numbers, the location where each was found in the victim's vehicle, candidate SBI numbers, finger numbers and what seems like the number of points found by an unknown examiner or database. Those documents, however, did not provide defendant with the length and breadth of information Williams testified to justifying her conclusion that the prints matched. That testimony—previously undisclosed—engendered the surprise element decried by the LaBrutto Court. 114 N.J. at 205.

Mendez's report, as the trial court found, simply reported the AFIS results. And, as we noted, there are only eight items listed on the request for latent fingerprint examination form. The detective said he lifted nine prints. Item six lists two fingers, numbers three and four, and notes "pass[enger] door ext[erior]

panel" in the comment section. The SBI number related to that entry does not match either SBI number listed next to items four and five which are the only entries associated with "pass[enger] door ext[erior] glass"; we do not see an entry for a print found on the interior glass of the passenger-side door.

Moreover, without the detailed analysis testified to by Williams, defendant and his counsel were not in a position to intelligently decide whether a defense expert was required or, if one was, to discuss the basis for the State's expert's opinion with his own expert. Further, until Williams testified, defendant was unaware that Williams did not analyze every print reviewed by her subordinate, or that a subordinate had performed an analysis. Defendant did not have an opportunity to explore the difference between the points listed in the request for latent fingerprint examination form and the reduced number testified to by Williams. As defense counsel said during her lengthy and strenuous objection prior to Williams taking the stand, "[t]here's nothing for me to cross-examine on, because there's no report . . . that says . . . what was done[;] that is, how it was analyzed[.]"

With the benefit of Williams's analysis, transcribed from her trial testimony, defendant proffered in his merits brief some of the areas that could have been explored on cross-examination if the basis for Williams's testimony

was disclosed in a report or N.J.R.E. 104 hearing, including adherence to forensic fingerprint examination standards requiring blind verification of previously obtained results and documentation of the steps taken when conducting the examination.[9]

As the State conceded in its merits brief, only one of the victims identified defendant as a perpetrator; three victims were unable to identify defendant as one of the two criminals, and their descriptions were either general or did not match defendant. Considering the divergent eyewitness-identification testimony relating to defendant, the fingerprint identification of defendant was key to the State's case, as evidenced by the State's summation. Recognizing the vulnerability of the eyewitness identifications, the assistant prosecutor characterized the fingerprint evidence as "the one indisputable fact in this case," and "the defining moment" upon which the jury should find defendant guilty.

We determine the State's failure to provide the expert's report prejudiced defendant, recognizing "'[p]rejudice' in this context refers not to the impact of

_____

[9] We do not offer any opinion on the propriety of all standards defendant contends were violated, noting only those that we discern could have been used to cross-examine Williams during the defendant's trial. We leave evidentiary rulings to the trial judge, to be made in the context of any future trial. See State v. Green, 236 N.J. 71, 80-81 (2018) ("[T]he admissibility of evidence at trial is left to 'the sound discretion of the trial court.'" (quoting State v. Willis, 225 N.J. 85, 96 (2016))).

the testimony itself, but the aggrieved party's inability to contest the testimony because of late notice." <u>Washington</u>, 453 N.J. Super. at 191 (quoting <u>Heisler</u>, 422 N.J. Super. at 415.)

Although we do not ascertain that the State set out to mislead defendant, the assistant prosecutor admitted to the trial court that the State intended to call Detective Mendez as its fingerprint expert. The trial court recalled that when defendant raised an issue about the sufficiency of the notice provided regarding Mendez's findings, "the State had said, and this may have been in chambers, but the State had represented . . . they could call someone from AFIS instead, because the defense has the [request for latent fingerprint examination form]." The assistant prosecutor had previously told the trial court that he was advised "the New Jersey State Police . . . said they don't testify." It is apparent, therefore, that the State did not initially intend to call Williams as its expert. While there is no evidence that the State intended to mislead the defense, its sudden change of plans resulted in its failure to provide Williams's report.

Considering the tripartite <u>LaBrutto</u> factors, we conclude the trial court abused its discretion by allowing the State to present Williams's testimony without providing any report, especially after denying defense counsel an opportunity to learn the basis for Williams's opinions at an immediate N.J.R.E.

19

104 hearing, which did not, in itself, require a continuance beyond the length of the hearing that could have taken place that day. See Washington, 453 N.J. Super. at 190-91. As such, we are constrained to reverse and remand this matter for a new trial. In light of the possibility of that trial, we offer the following comments regarding some of the issues raised during the last trial.

As to the use by Williams of the AFIS report, we note our prior holding that "hearsay statements upon which an expert relies are admissible, not for establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached." State v. Humanik, 199 N.J. Super. 283, 305 (App. Div. 1985). We also note that the trial court sustained defendant's objection to Williams's testimony that her subordinate found more points of comparison than she, but the court did not strike that testimony. It should have so the jury knew it could not consider that testimony in its deliberations.

We also caution against the State eliciting a law enforcement officer's testimony that a car viewed on a surveillance video "matched the description of the . . . vehicle that was involved in the incident," or that a detective observed defendant driving a vehicle "similar" to that seen on the video. The detective, testifying as a lay witness, could identify vehicles in still photographs or video based on his perceptions, see State v. McLean, 205 N.J. 438, 459 (2011), but he

is in no better position than the jury to compare depictions of vehicles than jurors, see id. at 462. Matters "within the competence of the jury" are for the collective wisdom of the jury to assess. See State v. Sowell, 213 N.J. 89, 99 (2013).

Although the model jury charge for carjacking does not explicitly require the trial court to include the definition of attempt, see Model Jury Charges (Criminal), "Carjacking (N.J.S.A. 2C:15-2)" (rev. June 13, 2005), the better course would be to provide the attempt instruction because this case involved the perpetrators' "attempt to commit an unlawful taking of a motor vehicle," N.J.S.A. 2C:15-2(a), not a completed theft. See State v. Gonzalez, 318 N.J. Super. 527, 535-37 (App. Div. 1999). An accurate instruction on this material portion of the carjacking statute would provide a better roadmap for the jury in its deliberations. Id. at 535.

We also agree with defendant that the trial court should have instructed the jury using the substantial step portion of the attempt jury charge in connection with the aggravated assault counts.[10] For those counts where the

---

[10]   As we described by State v. Condon, there are three types of attempt recognized by statute:

State contends the aggravated assault was not completed, the substantial step instruction is appropriate. Condon, 391 N.J. Super. at 617.

Finally, we have previously warned against the use of a defendant's refusal to admit guilt to increase a sentence. See State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985) (noting our "view that a defendant's refusal to acknowledge guilt following a conviction is generally not a germane factor in the sentencing decision"). We note, however, that when a defendant fails to take responsibility in the context of an underlying factor of a crime, it may be used to find an aggravating factor. See State v. Carey, 168 N.J. 413, 426-27 (2001) (holding a trial court's finding that defendant was a risk to commit another offense, N.J.S.A. 2C:44-1(a)(3), was supported by the defendant's letter in

> The first category, [impossibility,] . . . is "where the criminal act is complete but for the attendant circumstances which did not coincide with the actor's reasonable belief"; the second, [when causing a particular result is an element of the crime,] . . . is "where the criminal act is very nearly complete and requires one more step either beyond the actor's control or not requiring his control for completion"; and the third, [substantial step,] . . . is "where the actor has taken a substantial step toward commission of a crime."
>
> [391 N.J. Super. 609, 615-616 (App. Div. 2007) (citations omitted) (quoting Cannel, N.J. Criminal Code Annotated, comment 2 on N.J.S.A. 2C:5-1 (2006)).]

A-3772-16T4

which he "expresse[d] remorse, but [did] not directly accept responsibility for the crash or admit that he ha[d] a problem of drinking and driving").

In light of our decision, we need not address defendant's remaining arguments. Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION