**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0843-17T3

DAMIEN ROSE BRUNO, a minor
by SAYDEE LEE FIGUEROA, as
General Administratrix and
Administratrix Ad Prosequendum
of the Estate of Damien Rose Bruno,
Deceased, and SAYDEE LEE
FIGUEROA, Individually,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

JEFFERSON STREET ASSOCIATES,
LLC and/or WINMORE ASSN, GREG
CONN, T.R.C. MANAGEMENT and
FEDERICO BRUNO a/k/a FREDERICO
BRUNO a/k/a FREDRICOT BRUNO,
a/k/a FREDRICO BRUNO,

      Defendants,

and

JERSEY CITY POLICE DEPARTMENT,
JERSEY CITY POLICE CHIEF THOMAS
J. COMEY, and CITY OF JERSEY CITY,

      Defendants-Respondents/

Cross-Appellants.
_____

MADELYN CALDERON,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

JEFFERSON STREET ASSOCIATES,
LLC and/or WINMORE ASSN, GREG
CONN, T.R.C. MANAGEMENT, and
FEDERICO BRUNO, a/k/a FREDERICO
BRUNO, a/k/a FREDRICOT BRUNO,
a/k/a FREDRICO BRUNO,

      Defendants,

and

JERSEY CITY POLICE DEPARTMENT,
JERSEY CITY POLICE CHIEF THOMAS
J. COMEY, and CITY OF JERSEY CITY,

      Defendants-Respondents/
      Cross-Appellants.
_____

      Argued February 4, 2020 – Decided March 23, 2020

      Before Judges Yannotti, Hoffman and Currier.

      On appeal from the Superior Court of New Jersey, Law
      Division, Hudson County, Docket Nos. L-3060-14 and
      L-3061-14.

Evelyn Padin argued the cause for appellants/cross-respondents (Law Office of Evelyn Padin, attorneys; Eliot Skolnick, on the briefs).

Stevie Darrel Chambers, Assistant Corporation Counsel, argued the cause for respondents/cross-appellants (Peter J. Baker, Corporation Counsel, attorneys; Stevie Darrel Chambers, on the briefs).

PER CURIAM

On July 27, 2012, Frederico Bruno brutally attacked Saydee Lee Figueroa, his former paramour and the mother of his child, Damien Rose Bruno, and Madelyn Calderon. He slashed and beat the women and then pushed or threw Figueroa and Damien out a third-floor window. Figueroa and Calderon sustained serious permanent injuries, and Damien, who was three months old at the time, died several days later.

Figueroa, on her own behalf and as administratrix of Damien's estate, and Calderon filed complaints asserting claims against the Jersey City Police Department (JCPD), then-Chief of the JCPD Thomas J. Comey, and the City of Jersey City (City).[1] The trial court granted defendants' pre-answer motion to

---

[1] Plaintiffs also asserted claims against Jefferson Street Associates, LLC, Winmore Association, Greg Conn, T.R.C. Management (collectively, the Jefferson Street defendants), the owners, operators, or managers of the apartment building where the assaults took place, and Bruno. The claims against the Jefferson Street defendants were later resolved and the court entered a

A-0843-17T3

dismiss the claims based on the failure to arrest Bruno and enforce a temporary restraining order (TRO) Figueroa had obtained against Bruno. The court found these claims were based on discretionary actions for which defendants are immune from liability under the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3.

However, the court denied defendants' motion to dismiss the claims based on defendants' failure to serve the TRO on Bruno, defendants' failure to accurately answer Bruno's station-house inquiry as to whether he had any open arrests warrants, and negligent hiring. The court found these claims were based on actions that could be considered ministerial, for which defendants are not immune from liability under the TCA.

Defendants later filed a motion for summary judgment. The court granted the motion as to the claim of negligent hiring but denied the motion as to the claim based upon defendants' failure to serve the TRO on Bruno and their failure to accurately respond to Bruno's station-house inquiry. The court found there were genuine issues of material fact which precluded the grant of summary

---

default judgment against Bruno. Because this appeal only involves plaintiffs' claims against the JCPD, Comey, and the City, we refer to these parties as defendants.

judgment on these claims. Defendants filed a motion for reconsideration, which the court denied.

Plaintiffs' remaining claims against defendants were tried before a jury. After plaintiffs completed the presentation of their case, defendants moved to dismiss the claims, pursuant to Rule 4:37-2(b). The trial judge granted the motion and entered judgment for defendants. This appeal and defendants' cross-appeal followed.

On appeal, plaintiffs argue that the trial judge erred by: granting defendants' motion to dismiss these claims at trial; excluding probative, material evidence; barring them from calling certain witnesses at trial; and failing to adhere to the prior rulings by the motion judges. They also argue that the court erred by dismissing their failure-to-arrest claims.

In their cross-appeal, defendants argue that the court erred by denying their initial motion to dismiss the entire complaint pursuant to Rule 4:6-2(e). In addition, they argue that the court erred by denying their motion for summary judgment on plaintiffs' claims for failure to serve the TRO and accurately answer Bruno's inquiry at the police station.

For the reasons that follow, we conclude the court did not err by dismissing plaintiffs' claims against defendants based on the failure to arrest

5

Bruno, serve the TRO, and accurately respond to Bruno's station-house inquiry regarding outstanding warrants, and reject plaintiffs' arguments regarding the trial judge's evidentiary rulings. In view of our decision, the issues raised in the cross-appeal are moot. Therefore, we affirm on the appeal and dismiss the cross-appeal.

## I.

We begin our review with a summary of the evidence presented at trial. Figueroa and Bruno began dating when they were in high school. It appears that over time, Bruno became physically and verbally abusive to Figueroa, and this abuse worsened after she became pregnant. On October 10, 2011, while she was pregnant, Figueroa obtained a TRO against Bruno and filed a criminal complaint against him.

However, on October 19, 2011, Figueroa agreed to dismiss the TRO. She stated that she still loved Bruno and wanted to give him another chance, but she later ended her relationship with him. Although his relationship with Figueroa had ended, Bruno would visit the baby.

In June 2012, Figueroa and Damien moved in with Calderon in Calderon's one-bedroom, third-floor apartment in Jersey City. At that time, Figueroa was nineteen years old, Calderon was twenty-one and Damien was two months old.

Shortly after Figueroa moved in with Calderon, Bruno visited the apartment to see Damien.  A few weeks later, on July 20, 2012, while Figueroa and Calderon were sleeping, Bruno broke into the apartment through the fire-escape window. Bruno began to assault Figueroa and took her cell phone.  Calderon woke up. She said Figueroa looked scared and had marks on her face and neck.  Calderon confronted Bruno and told him to leave.  After Bruno departed, Figueroa called the police, using Calderon's phone.

Officer Augustino Lopez and other officers of the JCPD responded to the call.  Officer Lopez was familiar with Bruno because he had previously arrested and served him with the TRO issued in October 2011.  The officers transported Figueroa to the police station.  Based upon Figueroa's visible injuries and her statement identifying Bruno as the person who injured her and stole her phone, warrants were issued for Bruno's arrest on charges of assault and theft.

The police did not attempt to contact Bruno on Figueroa's cell phone. Although Figueroa gave the officers Bruno's last-known Jersey City address, she told them he was no longer living there.  Figueroa provided the officers with Bruno's phone number and a location where he spent time during the day. Lopez testified that he had seen Bruno in a particular neighborhood in the City.

A-0843-17T3

On July 22, 2012, Bruno spoke with Figueroa and asked her to drop the charges against him. She refused and told him he had to stop mistreating her. On July 24, 2012, Bruno returned to Calderon's apartment, accompanied by a friend. He wanted to see Damien. Bruno was verbally abusive and threatened Figueroa. She told him to leave. After Bruno left, Figueroa noticed her keys to the apartment were missing. She called the police.

When Officer Alberto Colon arrived at the apartment, Figueroa and Calderon told him Bruno had stolen the keys. Figueroa and Calderon testified that they also told Colon about what happened on July 20, 2012. The officer testified, however, that he was unaware of the existing warrant for Bruno's arrest and he did not run a search for any outstanding warrants.

Colon did not issue a warrant for Bruno's arrest because of the low value of the items he had allegedly stolen, but he told Figueroa she could file a complaint in municipal court. Colon did not treat the matter as a domestic violence incident because he thought of it as merely a theft. Later, Calderon spoke with the wife of the building's superintendent about the missing keys; however, the superintendent did not change the locks to the apartment.

On July 25, 2012, Figueroa applied for a TRO against Bruno and the court issued the TRO that day. Among other things, the TRO prohibited Bruno from:

returning to Figueroa's residence, engaging in any future acts of domestic violence, and having any contact with Damien. The order generally required law enforcement to serve and enforce the order, protect Figueroa, and assist her in retrieving the keys to the apartment.

In addition, the order stated that Figueroa had been unable to provide the court with Bruno's address. It stated that the court would not schedule a final hearing in the matter until Figueroa provided Bruno's address and he was served with the TRO.

The following morning, July 26, 2012, Bruno entered the JCPD's Bergen Avenue station. He remained there for approximately three minutes and forty-nine seconds between 9:32 a.m. and 9:36 a.m. While at the station, Bruno spoke with Officer Titus Johnson. Plaintiffs claimed Bruno asked Johnson if he had any outstanding warrants, but there was no direct evidence as to what Bruno said to Johnson.

Johnson testified that Bruno's hair was sticking up. He stated that Bruno's eyes were "kind of bulging," he had holes in his shirt, and he looked "kind of ragged like he was sleeping out in the street or something . . . ." Johnson said it appeared there was something wrong with Bruno. He thought Bruno might be homeless, mentally ill, or under the influence of drugs. Johnson testified that

he tried to assist Bruno. He asked him why he thought there might be a warrant out for him, and he explained there are different types of warrants.

According to Johnson, Bruno appeared confused and did not answer his questions. Johnson stated that he "didn't get a chance" to ask Bruno for identifying information before Bruno left the building. He made no attempt to stop Bruno from leaving the building because he "had no reason to detain him." Johnson did not report his interaction with Bruno to a supervisor.

On July 26, 2012, Figueroa, Calderon, and Damien spent the night at Calderon's mother's home. The following morning, at about 7:00 a.m., they returned to Calderon's apartment. They did not know that Bruno was hiding inside the apartment. As Figueroa entered the bedroom, Bruno came out from under the bed and attacked her with a meat cleaver. Figueroa grabbed Damien and attempted to leave the apartment, but Bruno refused to allow her to leave. He said he was going to kill her.

Bruno ordered Calderon to go into the bathroom. She complied but opened the bathroom door a bit and observed Bruno attempting to force his way into the bedroom. Figueroa testified that the last thing she recalled was Bruno beating her in the bedroom, while she held Damien. Calderon recalled seeing Bruno run out of the bedroom, saying "oh, shit, she is dead."

A-0843-17T3

It appears that Bruno pushed or threw Figueroa and Damien out of the third-floor bedroom window. The window's air conditioner was found on the pavement below, along with Figueroa and Damien. Bruno resumed his attack on Calderon, this time using a knife. She was able to escape and seek help from a neighbor, who called the police. Neighbors observed Bruno beating Figueroa with a chair, as she lay on the pavement outside the building.

When the police arrived, Bruno was gone. Figueroa and Calderon had suffered serious, permanent injuries. Several days later, Damien died as a result of the injuries he sustained in the attack. Thereafter, the police arrested Bruno. He was later charged and found guilty of, among other offenses, murder and two counts of attempted murder.

During the trial in this matter, plaintiffs presented testimony from Joseph Blaettler, who was qualified as an expert in police procedure and domestic violence. Blaettler stated that generally after the court issues a domestic violence restraining order, the court's personnel will enter the order into a centralized computer database. The order is immediately available to law enforcement throughout the State.

Blaettler also testified that the clerk of the county in which the order is entered will fax a copy of the order to the police department in the municipality

A-0843-17T3

where the order is to be served. Blaettler stated that in his experience, after the police department receives the order, it will assign an officer to serve it. Thereafter, the police department will inform the court that the person has been served or it was unable to effect service.

Blaettler testified that in his opinion, defendants did not carry out what he viewed as ministerial duties. He said defendants failed to "check to see if there was a restraining order available," and did not serve or attempt to serve the TRO on Bruno. He admitted, however, that he saw no evidence that the July 25, 2012 TRO had been entered into the central registry's database or that the TRO was faxed to the JCPD before July 27, 2012.

Blaettler opined that on July 26, 2012, Johnson was negligent in carrying out his ministerial duties because he did not immediately ask Bruno for identifying information, including his name and date of birth, when Bruno came to the police station. He also opined that Johnson could have detained Bruno for investigation on reasonable suspicion that he was under the influence of narcotics.

Blaettler testified that if Johnson had detained Bruno, he then could have obtained Bruno's identifying information. He could then have determined if

there were any outstanding warrants for Bruno's arrest, or restraining orders that should be served.

## II.

We first consider plaintiffs' contention that the trial judge erred by dismissing their claims against defendants based on the failure to serve the TRO and accurately answer Bruno's station-house inquiry regarding outstanding warrants. Plaintiffs contend they presented sufficient evidence to allow the jury to consider these claims.

As noted previously, after plaintiffs had presented their case, defendants sought involuntary dismissal of the claims pursuant to Rule 4:37-2(b). The rule provides:

> After having completed the presentation of the evidence on all matters other than the matter of damages (if that is an issue), the plaintiff shall so announce to the court, and thereupon the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal of the action or of any claim on the ground that upon the facts and upon the law the plaintiff has shown no right to relief. Whether the action is tried with or without a jury, such motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor.
>
> [Ibid.]

In considering a motion to dismiss under Rule 4:37-2(b), the trial court must accept as true all evidence supporting the causes of action, including all legitimate inferences that can be deduced therefrom. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). We apply the same standard when we review the grant or denial of such a motion. Ibid.; ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 510-11 (2014); Hitesman v. Bridgeway, Inc., 218 N.J. 8, 25-26 (2014).

Here, the trial judge found that the cause of action for failure to serve the TRO must be dismissed because plaintiffs did not present any evidence that the restraining order was ever sent to or received by the JCPD. The judge further found that the claim based on the failure to accurately answer Bruno's station-house inquiry about open warrants must be dismissed because it amounted to a claim that the officer erred by failing to detain Bruno and compel him to provide identifying information. The judge found the claim was barred under N.J.S.A. 59:5-5, which provides public employees and entities with immunity from liability for a failure to arrest.

The TCA re-established sovereign immunity after common law immunity had been abrogated by the Supreme Court in Willis v. Department of Conservation & Economic Development, 55 N.J. 534, 536-41 (1970). See Velez

v. City of Jersey City, 180 N.J. 284, 289 (2004); Alston v. City of Camden, 168 N.J. 170, 176, 181 (2001). The TCA is dispositive with respect to the nature, extent, and scope of state and local tort liability for causes of action accruing on and after its effective date. N.J.S.A. 59:1-2; Velez, 180 N.J. at 289-90.

Public entity immunity is the general rule under the TCA and liability is the exception. Lee v. Brown, 232 N.J. 114, 127 (2018); Alston, 168 N.J. at 176; Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 495 (App. Div. 2007). The TCA states:

> a. Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.
>
> b. Any liability of a public entity established by this act is subject to any immunity of the public entity and is subject to any defenses that would be available to the public entity if it were a private person.
>
> [N.J.S.A. 59:2-1.]

Furthermore, N.J.S.A. 59:2-3(a) states that "a public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity[.]" N.J.S.A. 59:2-3(d) provides, however, that "[n]othing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions."

15

A. Claim Based on Failure to Serve the TRO.

As noted, plaintiffs argue that the judge erred by dismissing their claim based on defendants' failure to serve the TRO upon Bruno. They assert this was a ministerial duty because service of the order is required by N.J.S.A. 2C:25-28(l), and the TRO entered in this case expressly required law enforcement to serve the order upon Bruno.

We need not determine whether service of a TRO issued pursuant to the Prevention of Domestic Violence Act (PDVA) is a ministerial act for which there is potential liability under the TCA because plaintiffs did not present sufficient evidence to support this claim. As the trial judge noted, plaintiffs presented no evidence from which the jury could find that the JCPD received a copy of the July 25, 2012 TRO, or that court personnel had placed the TRO in the central registry's database.

Plaintiffs argue, however, that they did not have to prove that the TRO actually was entered into the central registry's database or faxed to the JCPD before July 27, 2012. In support of their argument, they rely upon N.J.S.A. 2C:25-28(l), which requires the court to forward a restraining order to the appropriate law enforcement agency for service, and requires law enforcement to serve the order on the defendant "immediately." Plaintiffs also rely upon

N.J.S.A. 2C:25-34, which requires the Administrative Office of the Courts to "establish and maintain a central registry of all persons who have had domestic violence restraining orders entered against them . . . ."

Based upon these statutory provisions, plaintiffs argue that a jury could find that defendants had constructive knowledge of the TRO entered by the court. We cannot agree. Here, the trial judge correctly found that defendants cannot be found liable for failing to serve a TRO that they did not receive or could not access on the central registry's database.

Plaintiffs further argue that Blaettler's testimony provided a sufficient basis for the jury to find that defendants had constructive knowledge of the TRO entered on July 25, 2012. As stated previously, Blaettler testified that generally, when the court enters a TRO, the court's personnel place the order in the central registry's database, and the county clerk faxes the order to the police department in the community where the order is to be served.

Blaettler admitted, however, that he had no evidence that these actions were taken regarding the TRO entered against Bruno on July 25, 2012. Therefore, Blaettler's testimony did not provide a sufficient factual basis to find that defendants had constructive knowledge of the July 25, 2012 TRO.

A-0843-17T3

In support of their arguments on appeal, plaintiffs rely upon Campbell v. Campbell, 294 N.J. Super. 18 (Law Div. 1996). In Campbell, the question presented on a summary judgment motion was "whether police officers are immune under the [TCA] for failure to make an arrest under a domestic violence order." Id. at 20. The officers at issue had responded to a call relating to "an unwanted guest" at the complainant's home, and discovered that the complainant's estranged husband was the "unwanted guest." Id. at 20-21. The officers instructed him to leave but made no arrest, id. at 21, and they denied knowledge of any restraining order. Id. at 22.

However, the complainant alleged she told the officers about the restraining order. Id. at 21. Moreover, since there was "no dispute that the [local police department] did receive a copy of the domestic violence order prior to the incident," the Law Division found the officers' denials of knowledge were "irrelevant." Id. at 22. The Law Division then considered whether any TCA immunities applied to the officers' actions. Id. at 22-28.

Plaintiffs' reliance upon Campbell is misplaced. The facts of this case are different. Here, defendants denied receiving the July 25, 2012 TRO before the July 27, 2012 attack, and plaintiffs presented no evidence to establish that defendants received the TRO. Furthermore, plaintiffs presented no evidence

from which the jury could find that court personnel placed the TRO in the central registry database, or that the county clerk had faxed the order to the JCPD before July 27, 2012.

B.  Claim Based on Failure to Answer Bruno's Station-House Inquiry.

Plaintiffs allege defendants were negligent in failing to accurately answer Bruno's station-house inquiry as to whether he had any outstanding warrants. They claim this was a ministerial duty for which defendants are liable under the TCA.  They contend that the trial judge erred by dismissing this claim at trial.

The trial judge found that this claim was essentially one based on defendants' alleged negligent failure to arrest Bruno when he came to the police station.  The judge therefore found this claim was barred by N.J.S.A. 59:5-5, which states that neither a public entity nor public employee may be liable for an injury caused by "the failure to make an arrest . . . ."

Plaintiffs argue that their claim is not based on a failure to arrest, but rather upon the officer's negligent failure to respond accurately to Bruno's inquiry as to whether he had any outstanding warrants.  They also claim defendants should have detained Bruno for investigation.  They contend the immunity under N.J.S.A. 59:5-5 does not apply to investigative detentions.

They further argue that investigative detentions are ministerial rather than discretionary acts, for which there is no immunity under the TCA.

We need not determine whether the TCA immunity under N.J.S.A. 59:5-5 applies to a failure to detain a person for investigation. We are convinced that an officer's decision as to whether to detain a person for investigative purposes is a discretionary act for which the officer and a public entity are immune from liability under N.J.S.A. 59:2-3(a) and N.J.S.A. 59:3-2(a).

A ministerial act is an act which "public officers are required to perform upon a given state of facts in a prescribed manner, in obedience to the mandate of legal authority and without regard to their own judgment or opinion concerning the propriety or impropriety of the act to be performed." Ritter v. Castellini, 173 N.J. Super. 509, 513-14 (Law Div. 1980). Detaining an individual for investigation does not meet this definition of a ministerial act.

In determining whether to detain an individual for investigation, a police officer must have reasonable and particularized suspicion that the individual is engaging in, or about to engage in, criminal activity. State v. Rosario, 229 N.J 263, 272 (2017). This requires the officer to carefully consider the relevant facts and exercise judgment. Id. at 276-77. The officer's determination calls for the exercise of discretion. It is not a ministerial act.

A-0843-17T3

Here, Johnson testified that he did not believe he had any basis to detain Bruno. He stated that while Bruno appeared ragged and agitated, it was not clear to him what Bruno's problem was. The officer thought Bruno may have been homeless, mentally ill, or under the influence of drugs. Under these circumstances, detaining Bruno for purposes of investigation required Johnson to exercise discretion. Therefore, the TCA precludes the imposition of liability upon defendants for their alleged failure to detain Bruno. N.J.S.A. 59:2-3(a); N.J.S.A. 59:3-2(a).

We also reject plaintiffs' contention that they presented sufficient evidence to support their claim that Johnson was negligent in failing to obtain Bruno's name and other identifying information when he came to the police station. Plaintiffs argue that Johnson had a ministerial duty to respond accurately to Bruno's inquiry as to whether he had any outstanding warrants.

As we have explained, Johnson testified that he attempted to assist Bruno and tried to get information from him. He asked Bruno why he had been told he had warrants, and if he had any "domestic violence issues." Johnson did not ask Bruno for his date of birth but he did ask Bruno to provide "his information." He told Bruno the information that he needed. The officer then went to get a

21

piece of paper so that Bruno could write the information down for him, but Bruno left the building.

Thus, even if Johnson had a ministerial duty to ask Bruno to provide his name and other identifying information, the evidence established that Johnson attempted to obtain that information but was unable to do so because Bruno was uncooperative and left the police station. Plaintiffs failed to present sufficient evidence to support their claim.

In arguing that the judge erred by dismissing this claim, plaintiffs rely upon Wuethrich v. Delia, 155 N.J. Super. 324 (App. Div. 1978). In that opinion, we stated that police officers "have a duty to investigate information from citizens concerning unlawful or criminal activity . . . ." Id. at 326 (citing State v. Royal, 115 N.J. Super. 439, (App. Div. 1971)). We also stated that the failure of the police to make an arrest as a result of such an investigation "does not subject the municipality to tort liability." Ibid. (citing N.J.S.A. 59:5-5).

Plaintiffs' reliance on Wuethrich is misplaced. Here, the evidence established that Johnson endeavored to obtain identifying information from Bruno so that he could respond to his inquiry, but he was unable to do so because Bruno was not cooperative and left the police station. Thus, Johnson did not breach any duty to investigate potential criminal activity. Moreover, to the

extent plaintiffs are claiming Johnson negligently failed to arrest Bruno, the claim is barred by N.J.S.A. 59:5-5.

III.

Plaintiffs argue that the trial judge erred by failing to follow the law of the case when he granted defendants' motion to dismiss their claims at trial. Plaintiffs note that when defendants moved pursuant to Rule 4:6-2(e) to dismiss the complaint for failure to state a claim upon which relief could be granted, the motion judge ruled that they had alleged sufficient facts to support their claims based on the failure to serve the TRO and answer Bruno's station-house inquiry.

Plaintiffs also note that when defendants later sought summary judgment on these claims, another judge found there were genuine issues of material fact that had to be resolved by the trier-of-fact. Plaintiffs contend that the law of the case doctrine required the trial judge to follow these earlier decisions when he ruled on defendants' motion to dismiss at trial. We disagree.

The law of the case doctrine discourages the re-litigation of issues that have been previously decided during the course of a particular case. State v. Brown, 236 N.J. 497, 522 (2019) (citing State v. Ruffin, 371 N.J. Super. 371, 390 (App. Div. 2004)). However, application of the doctrine, as applied to

interlocutory orders or rulings, is discretionary and should be "applied flexibly to serve the interests of justice." State v. Reldan, 100 N.J. 187, 205 (1985).

The doctrine does not prevent the reversal of rulings when the rulings are clearly erroneous, or when substantially different evidence is presented at trial. Underwood v. Atl. City Racing Ass'n, 295 N.J. Super. 335, 340 (App. Div. 1996). Furthermore, the doctrine does not limit the inherent power of a trial judge to modify an interlocutory order prior to entry of final judgment. Tully v. Mirz, 457 N.J. Super. 114, 128-29 (App. Div. 2018).

Therefore, in granting defendants' motion to dismiss under Rule 4:37-2(b), the trial judge was not bound by the pre-trial rulings by other judges on defendants' motions to dismiss and for summary judgment. Tully, 457 N.J. Super. at 128-29; Akhtar v. JDN Props. at Florham Park, LLC, 439 N.J. Super. 391, 399-403 (App. Div. 2015). The judge reconsidered those rulings in light of the evidence that plaintiffs presented at trial.

As we have determined, the judge's decision to dismiss the claims was supported by the record and legally correct. We therefore reject plaintiffs' contention that the judge erred by failing to adhere to the earlier decisions by the motion judges.

A-0843-17T3

IV.

Next, plaintiffs argue the trial judge erred by refusing to permit them to: admit Bruno's out-of-court statements; introduce Calderon's recorded statement; and present trial testimony from Bruno, Sergeant Raymond Mahan, Evette Fresse, and Comey.

It is well-established that "the admissibility of evidence at trial is left to 'the sound discretion of the trial court.'" State v. Green, 236 N.J. 71, 80-81 (2018) (quoting State v. Willis, 225 N.J. 85, 96 (2016)). Therefore, we review the trial court's evidentiary rulings for abuse of discretion. Id. at 81 (citing State v. Rose, 206 N.J. 141, 157 (2011)). We will not reverse unless the trial court's ruling represents a "clear error of judgment." Ibid. (citing State v. Barden, 195 N.J. 375, 391 (2008)).

A. Bruno's Out-of-Court Statements.

Plaintiffs contend the trial judge should have allowed them to introduce: (1) Bruno's videotaped, post-arrest statement to the police, (2) an internal affairs report, containing Mahan's summary of his interview with Bruno, and (3) Bruno's statement at his sentencing hearing. The trial judge correctly found these statements were inadmissible hearsay because they were out-of-court

25

statements that plaintiffs intended to introduce for their truth. See N.J.R.E. 801(c) and N.J.R.E. 802.

Plaintiffs argue, however, that Bruno's out-of-court statements were admissible under N.J.R.E. 803(b)(1) as statements by a party-opponent. The rule permits admission of "[a] statement offered against a party which is the party's own statement . . ." State v. Covell, 157 N.J. 554, 572 (1999) (citing N.J.R.E. 803(b)(1)).

Therefore, N.J.R.E. 803(b)(1) allows the admission of the statement against Bruno, but not against any other party. One Step Up, Ltd. v. Sam Logistic, Inc., 419 N.J. Super. 500, 507-08 (App. Div. 2011); Theobald v. Dolcimascola, 299 N.J. Super. 299, 305-06 (App. Div. 1997). Thus, Bruno's statements could not be admitted against defendants.

Plaintiffs also contend Bruno's out-of-court statements were admissible under N.J.R.E. 803(c)(25) as statements against his interest. "The statement-against-interest exception is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably." State v. White, 158 N.J. 230, 238 (1999) (citing N.J.R.E. 803(c)(25)). Therefore, Rule 803(c)(25) does not permit the admission of self-

serving, exculpatory statements. State v. Nevius, 426 N.J. Super. 379, 393-97 (App. Div. 2012).

Bruno's out-of-court statements were clearly self-serving and exculpatory and not admissible under N.J.R.E. 803(c)(25). He denied complicity in the July 27, 2012 attack, and he attempted to blame the victims for his horrific actions. He also tried to implicate the JCPD by stating that he tried to turn himself in, but no one at the JCPD would listen to him.

We reject plaintiffs' contention that Bruno's statement that he turned himself in to the police was an admission of wrongdoing. At the police station, Bruno apparently asked Johnson if he had any outstanding warrants. He did not admit he did anything wrong or illegal.

Plaintiffs also contend Bruno's statements were admissible under N.J.R.E. 803(c)(2) as excited utterances. The exception applies to "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." Ibid. However, Bruno's out-of-court statements did not meet the conditions for admission under the rule.

Plaintiffs further argue that the statements attributed to Bruno in the JCPD's internal affairs report are admissible under the business-records

exception in N.J.R.E. 803(c)(6). "A police report may be admissible to prove the fact that certain statements were made to an officer, but, absent another hearsay exception, not the truth of those statements." Manata v. Pereira, 436 N.J. Super. 330, 345 (App. Div. 2014) (emphasis added). Plaintiffs have not established that a hearsay exception applies to the statements in the report.

B. Bruno's Proposed Trial Testimony.

Plaintiffs contend the trial judge erred by refusing to permit them to call Bruno as a witness at trial. The record shows that Bruno's counsel advised the judge that Bruno would exercise his Fifth Amendment right against self-incrimination. The judge also held a N.J.R.E.104 hearing, at which Bruno invoked his Fifth Amendment right and refused to answer any questions.

Nevertheless, plaintiffs argue they should have been permitted to call Bruno and question him in front of the jury about his interactions with Johnson on July 26, 2012. Plaintiffs contend the jury should have been able to witness Bruno invoking his constitutional right to remain silent.

The judge found, however, that there was no probative value in having Bruno appear at trial and refuse to answer any questions. The judge correctly ruled that Bruno would not offer any relevant testimony. The ruling was not a mistaken exercise of discretion.

C.  Calderon's Statement.

Plaintiffs argue that the trial judge erred by refusing to allow them to admit the recorded statement that Calderon gave to the police.  This was an out-of-court statement that plaintiffs intended to offer for its truth.  Therefore, the statement was inadmissible hearsay under N.J.R.E. 801(c) and N.J.R.E. 802.

Plaintiffs argue, however, that the statement could be admitted as an excited utterance under N.J.R.E. 803(c)(2), or as a business record under N.J.R.E. 803(c)(6).  These arguments were not presented in the trial court.

Even so, we are convinced the judge did not err by excluding Calderon's statement.  As stated previously, the statement would only be admissible as an excited utterance under N.J.R.E. 803(c)(2) if it related to a "startling event or condition" and was "made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate."

In determining whether to admit a statement pursuant to N.J.R.E. 803(c)(2), the court must consider whether "'the circumstances reasonably warrant the inference that [it] was made as an uncontrollable response to the shock of the event before reasoned reflection could have eliminated a self-

serving response.'" State v. Cotto, 182 N.J. 316, 328 (2005) (quoting Cestero v. Ferrara, 57 N.J. 497, 504 (1971)).

Calderon's statement was recorded four days after the July 27, 2012, attack. Plaintiffs failed to show that her statements were an "uncontrollable response" to this event. She also had several days in which to deliberate before she made her statement. Therefore, Calderon's statement was not admissible as an excited utterance under N.J.R.E. 803(c)(2).

Calderon's statement also was not admissible as a business record under N.J.R.E. 803(c)(6). The rule permits the admission of

> [a] statement contained in a writing or other record of acts, events, conditions and, subject to [N.J.R.E.] 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of the business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate it is not trustworthy.
>
> [Ibid.]

Calderon's statement was not a record made in the regular course of business. Even if the recording was such a record, her statements would only be admissible if they came within the purview of a separate hearsay exception.

A-0843-17T3

Manata, 436 N.J. Super. at 345. Plaintiffs have not established that Calderon's statements are admissible under any hearsay exception.

Moreover, even if the judge erred by excluding Calderon's recorded statement, the error was harmless. Calderon testified at trial, and her trial testimony was consistent with her recorded statement. Plaintiffs suffered no prejudice from the exclusion of the statement.

D. Mahan

Plaintiffs argue that the trial judge erred by not permitting them to question Mahan about the internal affairs investigation he undertook, including statements made by Bruno, Johnson, and Fresse during the investigation. Plaintiffs also argue that Mahan should have been permitted to testify about the JCPD's procedures for checking on outstanding warrants and responding to inquiries about warrants. They further argue that Mahan should have been allowed to testify that the computer system the JCPD used to check warrants was operational on July 26, 2012.

These arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We note, however, that any out-of-court statements by Bruno, Johnson, and Fresse that were set forth in Mahan's report were hearsay

and plaintiffs have not shown these statements were admissible under any hearsay exception.

Furthermore, testimony by Mahan was not needed to establish the procedures the JCPD followed for checking on warrants, since the jury heard such testimony from Johnson and Blaettler. In addition, it was undisputed that the computer system the JCPD used to check on warrants was operational on July 26, 2012, and Johnson did not use the system to determine if there were any outstanding warrants for Bruno.

E. Fresse

Plaintiffs contend the trial judge erred by not permitting them to question Fresse about her interactions with Bruno on July 26, 2012, at the municipal court. The judge ruled that Fresse could not testify because she had no recollection of interacting with Bruno. Moreover, when Fresse was shown the JCPD's internal investigation report during her deposition, the report did not refresh her recollection.

The judge therefore ruled that Fresse would not be able to present relevant evidence to the jury. Relevant evidence is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Since Fresse could not recall her interactions with Bruno, she had

no relevant information to provide to the jury. The judge's ruling was not a mistaken exercise of discretion.

F. Comey

Plaintiffs contend the trial judge should have permitted them to present Comey as a witness regarding the JCPD's policies with respect to responding to inquiries by members of the public regarding outstanding warrants. The judge ruled that plaintiffs could not call Comey as a witness to testify regarding these policies because during discovery plaintiffs failed to request that defendants designate a witness for this purpose, as required by Rule 4:14-2(c). The judge also found there was no probative value to Comey's testimony because he testified in the N.J.R.E. 104 hearing that he had only a "sketchy" recollection of the policies at issue.

The judge's ruling was not a mistaken exercise of discretion. As the judge noted, plaintiffs failed to ask defendants to identify a witness with a current knowledge of the JCPD's policies, as permitted by Rule 4:14-2(c). Furthermore, since Comey had only a "sketchy" recollection of the department's policies, he had no relevant testimony to provide concerning those policies.

In addition, plaintiffs have not shown that they were prejudiced by an inability to present testimony from Comey. The trial judge did not err by

33

dismissing plaintiffs' claim based on the failure to accurately respond to Bruno's warrant inquiry because, as the record shows, Johnson sought to obtain identifying information from Bruno, but he was unable to obtain that information because Bruno was uncooperative and left the police station. Testimony by Comey on the JCPD's procedures for answering warrant inquiries would not have affected the outcome of this matter.

V.

Plaintiffs also argue that the trial court erred by granting defendants' motion under Rule 4:6-2(e) to dismiss their claims based on an alleged failure to arrest Bruno. In their complaints, plaintiffs alleged that defendants were liable for the injuries and losses they sustained because defendants failed to perform their "ministerial duties to arrest and detain [Bruno], a known criminal who had an outstanding arrest warrant and active restraining order . . . and who personally appeared at the Jersey City police station to make inquiries concerning any open arrest warrants."

The motion judge found that defendants were immune from liability under N.J.S.A. 59:5-5 for failing to arrest Bruno. Defendants also were immune from liability because the alleged failure-to-arrest was "clearly discretionary" and not a ministerial act. See N.J.S.A. 59:2-3(a); N.J.S.A. 59:3-2(a).

In reviewing an order dismissing a claim pursuant to Rule 4:6-2(e), we undertake a de novo review of the claim. Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, PC, 237 N.J. 91, 108 (2019). Our "inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746 (1989).

On appeal, plaintiffs argue that the PDVA creates an exception to the arrest immunity of N.J.S.A. 59:5-5 because it requires the arrest of persons who allegedly commit acts of domestic violence. The PDVA provides in pertinent part:

> When a person claims to be a victim of domestic violence, and where a law enforcement officer responding to the incident finds probable cause to believe that domestic violence has occurred, the law enforcement officer shall arrest the person who is alleged to be the person who subjected the victim to domestic violence and shall sign a criminal complaint if:
>
> (1) The victim exhibits signs of injury caused by an act of domestic violence;
>
> (2) A warrant is in effect;
>
> (3) There is probable cause to believe that the person has violated [N.J.S.A.] 2C:29-9, and there is probable cause to believe that the person has been served with the order alleged to have been violated. If the victim

does not have a copy of a purported order, the officer may verify the existence of an order with the appropriate law enforcement agency; or

(4) There is probable cause to believe that a weapon as defined in [N.J.S.A.] 2C:39-1 has been involved in the commission of an act of domestic violence.

[N.J.S.A. 2C:25-21(a).]

Plaintiffs contend that because the PDVA requires an arrest under certain circumstances, the decision to arrest Bruno was ministerial rather than discretionary and therefore subject to potential liability under N.J.S.A. 59:2-3(d). We disagree.

A police officer's decision to arrest or not arrest a suspect for an alleged act of domestic violence is a discretionary act for which the officer is immune from liability under the TCA. S.P. v. Newark Police Dep't, 428 N.J. Super. 210, 228-33 (App. Div. 2012). See also Turner v. Twp. of Irvington, 430 N.J. Super. 274, 285-86 (App. Div. 2013) (rejecting argument that the PDVA's mandatory arrest provision trumps the TCA's immunity for failure to arrest in N.J.S.A. 59:5-5).

We therefore conclude the motion judge did not err by dismissing plaintiffs' claim against defendants based on the alleged failure to arrest Bruno for an act of domestic violence.

## VI.

In their cross-appeal, defendants argue that the trial court erred by denying their motion for summary judgment on plaintiffs' claims for negligent failure to serve the TRO and accurately respond to Bruno's station-house inquiry regarding outstanding warrants. Defendants contend there were no genuine issues of material fact as to these claims, and they were entitled to summary judgment. Because we have found that the judge did not err by dismissing these claims at trial pursuant to Rule 4:37-2(b), the issues raised in the cross-appeal are moot.

Affirmed on the appeal; the cross-appeal is dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0843-17T3