# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4297-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

L. A. W.,[1]

    Defendant-Appellant.

_____

Submitted December 8, 2020 – Decided January 14, 2021

Before Judges Yannotti, Haas and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 16-01-0101.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, on the brief).

Fredric M. Knapp, Morris County Prosecutor, attorney for respondent (Paula Jordao, Assistant Prosecutor, on the brief).

---

[1] We use initials to identify defendant and others to protect the identities of the victims of defendant's offenses. See R. 1:38-3(c)(9), (12).

PER CURIAM

Defendant was tried before a jury and found guilty of second-degree aggravated assault, contrary to N.J.S.A. 2C:12-1(b)(1), and other offenses. She was sentenced to an aggregate eight-year term of incarceration, with an eighty-five percent period of parole ineligibility, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals from the judgment of conviction dated April 6, 2018. We affirm.

I.

On February 18, 2016, a Morris County grand jury returned an indictment charging defendant with first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1) (count one); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count two); third-degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2) (count three); fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) (count four); two counts of second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (counts five and six); second-degree possession of a weapon (handgun) for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count seven); second-degree unlawful possession of a weapon (handgun), N.J.S.A. 2C:39-5(b) (count eight); two counts of third-degree possession of a weapon (knife, stun gun) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (counts nine and eleven); fourth-

2

degree unlawful possession of a weapon (knife), N.J.S.A. 2C:39-5(d) (count ten); fourth-degree unlawful possession of a prohibited device (stun gun), N.J.S.A. 2C:39-3(h) (count twelve); fourth-degree unlawful possession of a prohibited device (hollow point bullets), contrary to N.J.S.A. 2C:39-3(f)(1) (count thirteen); third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (count fourteen); two counts of second-degree endangering the welfare of a child, N.J.S.A. 24-4(a)(2) (counts fifteen and sixteen); third-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(3) (count seventeen); and three counts of fourth-degree contempt, N.J.S.A. 2C:29-9(b) (counts eighteen, nineteen, and twenty).

Thereafter, Judge Stephen J. Taylor granted the State's motions to admit defendant's statements to law enforcement, certain N.J.R.E. 404(b) evidence, and evidence that defendant possessed pills which were found at the crime scene. Counts seventeen through twenty were severed for trial. Judge Salem Vincent Ahto presided at the trial of the other charges.

We briefly summarize the evidence presented. Defendant and R.L. had been in a romantic relationship since 1992. They were never legally married but lived together as husband and wife with their three biological children, Jo.L.

3

(born in May 1994), Je.L. (born in February 1999), and Ji.L. (born in April 2000).

In 2012, defendant's and R.L.'s romantic relationship came to an end, but they continued to live together to raise their children and maintained separate bedrooms. It appears that by April 2012, defendant and R.L. argued regularly. Their arguments continued to escalate, and R.L. testified that he and the children felt unsafe.

That month, defendant discovered a personal lubricant in R.L.'s jeans. She yelled at him and stated, "You are a dead man walking." In addition, during an argument, defendant told R.L., "I want to kill you and your f---ing whore." R.L. testified he was afraid and traumatized, to the point that he locked his bedroom door at night and was "always looking out" for defendant.

On May 19, 2012, R.L. woke up and went to his home office, where defendant was on the computer. They began to argue. According to R.L., defendant slapped him in the face, and then threw the computer, monitor, and copy machine onto the floor.

Defendant then walked toward the garage and told R.L. she was going to get a hammer and kill him. He left the home and called the police. Sergeant George Quentz of the Montville Township Police Department (MTPD) arrived

4

and arrested defendant. Later that day, a judge entered a restraining order barring defendant from the home.

In June 2013, defendant and R.L. entered a property settlement agreement, which provided in part that R.L. would be the sole owner of the parties' residence and he would purchase defendant's ownership interest. Moreover, in September 2014, defendant and R.L. agreed he would have custody of the children. Between 2012 and 2015, defendant had visitation with the children.

Je.L. testified that he did not have a good relationship with defendant. In February 2015, defendant was making harassing phone calls and text messages to him, so he blocked her on his phone. On February 14, 2015, defendant appeared at the home for an unannounced visit. She made comments that upset Je.L. Thereafter, Je.L. did not have any contact with defendant.

By early March 2015, Jo.L. was no longer speaking with defendant. That month, R.L. and defendant were at a hockey game for Ji.L. Defendant told him she was a medium who "could see the past and talk to people that were dead." According to R.L., defendant said Je.L. had the same abilities and if R.L. did not allow her to help Je.L., she would kill herself. Ji.L. stopped communicating with defendant.

 A-4297-17T4

In March and April 2015, defendant sent emails to R.L. He testified that the emails were threatening and "getting nasty." In an email dated March 14, 2015, defendant told R.L. to "get that f-----g whore out of the house with our boys[.]" On March 19, 2015, defendant wrote that R.L.'s "silence indicates. . . you are unwilling to work this out." She stated that his "arrogance" would be his "downfall." She said she would not "stop" until she had her boys and "what's fair and just." R.L. also testified that in April and May 2015, defendant left voicemail messages on his office phone, in which defendant stated she wanted to speak to the children.

On May 17, 2015, between 7:00 and 8:30 p.m., R.L. returned home from a hockey game with Je.L. and Ji.L. Jo.L. was at home, sitting at the kitchen table. R.L. was in his office when he heard the garage door open. Defendant entered the house and walked into the office. She was holding a bag. R.L. told defendant she was not allowed in the home and asked her to go to the garage with him, so that they could speak. She said she would not leave without the children.

Defendant and R.L. walked out to the garage. He noticed defendant had a gun in one hand and the bag in other. He turned around and returned to the office to call the police. While there, R.L. heard Jo.L. screaming, "Mom, you're

A-4297-17T4

not supposed to be here. . . . What are you doing with the gun, Mom [?] Put it down, stop waving it around." R.L. started to go into the garage, but he heard defendant and Jo.L. continuing to scream at each other and went into the kitchen.

Jo.L. was studying at the kitchen table, when he noticed defendant standing in the kitchen holding a gun. He testified that defendant asked him, "Where's [your] dad's girlfriend? Where's the whore?" He said defendant held the gun, pointed it in his direction, and waved the gun back and forth as she spoke to him. Jo.L. stated that defendant was highly agitated, and he was scared and nervous.

When R.L. entered the kitchen, he and defendant began to yell at each other. Jo.L. testified that defendant and R.L. then began wrestling in the dining room, and R.L. screamed at him to grab defendant's gun. Jo.L. said he froze. He feared he might get shot, but he eventually called 9-1-1.

Meanwhile, Je.L. was upstairs, in his room. He testified that he heard Jo.L. shouting. He walked out of his bedroom and saw defendant at the bottom of the stairs. According to Je.L., defendant said "hi" and then walked into the kitchen. He ran down the stairs and entered the kitchen, where he saw defendant's bag on the kitchen counter. When R.L. returned from his office to the kitchen, he observed Jo.L. sitting at the kitchen table, yelling at defendant.

He then heard defendant state, "I'm going to shoot the whore. Where is the whore?" When Jo.L. responded that no one else was in the house, defendant stated, "Well, I'm going to shoot [R.L.]."

R.L. testified that defendant pointed the gun toward him and pulled the trigger but "nothing happen[ed]." He said defendant pointed the gun toward the ground and shook it, hoping to release the bullet that failed to discharge. She then pointed the gun toward him a second time. R.L. lunged at defendant, grabbed her hand with the gun, and held it against the freezer. R.L. dragged defendant to the table in the dining room.

When Jo.L. and Je.L. walked into the room, R.L. asked them to call the police and help him with the gun. R.L. testified that Je.L. came over to loosen defendant's grip on the trigger. Je.L. punched defendant in the face with a closed fist and took the gun from her. Jo.L. picked up the gun from the dining room table, placed it on the counter and called 9-1-1.

Defendant and R.L. fell to the floor. Defendant was face-down, and R.L. sat on top of her. He testified that defendant screamed he would "be dead if the gun had gone off." Je.L. saw a stun gun on the floor, which he placed on the table.

8

Ji.L. was upstairs at the time, listening to music in his room. He testified that he heard defendant's and R.L.'s voices. He also heard Jo.L. "shouting 'Mom' over and over again." He walked out of his bedroom, but when he heard a male voice say "gun," he returned to his room, closed the door, and moved a shelf and dresser in front of the door. He said he did this "[t]o keep [himself] safe from any potential danger from the gun."

Ji.L said he was concerned someone would get hurt, so he paced in his room and thought about what was happening downstairs. He heard R.L. instruct Jo.L. to call 9-1-1. He was scared and remained in his room for about ten minutes, until Jo.L. knocked on his door. When Ji.L. went downstairs, he saw defendant on the ground in the dining room. The police were present.

Sergeant Quentz was the first police officer to arrive in response to the 9-1-1 call. He observed R.L in the living room. R.L. was on top of defendant, holding her down, and Jo.L. was standing next to them. Quentz also observed clothes, pills and other items strewn on the floor, as well as an unsecured gun on the ground. He placed defendant in handcuffs.

Thereafter, two other police officers arrived. Quentz asked one of the officers to unload the gun. The officer released the gun's magazine and noticed it was loaded. The officer said there was a bullet in the chamber of the gun, but

he could not remove it. Quentz helped him remove the bullet. They noticed the magazine contained six hollow-point bullets.

One of the officers searched defendant. The officer found bullets and pills in her pocket. Defendant was holding pills in her clenched hand. The officers also found a knife and stun gun at the scene. Defendant's bag contained various items, including a driver's license, paperwork, a Bible, a stuffed doll, a camera case with thirty-two rounds of .22 caliber bullets, a stun gun case, and rubber gloves. Inside the doll, the officers found a handwritten note from defendant to Ji.L., which stated that she loved him.

Thereafter, detectives from the Morris County Sheriff's Office (MCSO) searched a residence in New York, where defendant had been staying since she was barred from the "marital" home. Among other items, the detectives recovered a floral box containing letters to each of the children, savings bonds addressed to the children, and a letter labeled "[L.A.F.'s] Final Wishes." In the letter, defendant set forth her wishes regarding her funeral arrangements and distribution of her property upon her death.

Sergeant Craig Brooks of the MCSO testified for the State as an expert in the identification of firearms and their operability. He examined the gun defendant possessed during the incident of May 17, 2015, as well as the gun's

magazine and six rounds. He testified the gun could be operated with the safety catch either on or off. He said a gun could be operable but still fail to discharge a bullet.

The State also presented testimony from a witness who had conducted a search of the State's firearms records. He said there was no record that defendant had submitted any firearm application in New Jersey, and there was no record showing a firearm permit had been issued to defendant in this State.

In addition, a forensic scientist with the New Jersey State Police testified as an expert in drug analysis. She stated that the pills defendant was in possession of during the incident on May 17, 2015, consisted of twelve tablets of Zolpidem, twenty-two tablets of Hydrocodone, and one tablet of Escitalopram.

After the State rested, defendant moved for a judgment of acquittal on certain counts of the indictment. Judge Ahto granted the motion in part. The judge dismissed counts eleven and twelve, charging possession of a weapon (stun gun) for an unlawful purpose and possession of a prohibited device (stun gun), respectively. The judge denied the motion as to the other counts.[2]

---

[2] As a result of the judge's ruling, counts thirteen through twenty of the original indictment were renumbered eleven to eighteen.

A-4297-17T4

Detective William Vanderhoof of the MTPD was called as a witness for the defense. He said he responded to the scene at approximately 10:00 p.m. on May 17, 2015. He took photographs and returned to police headquarters, where he informed defendant of her Miranda[3] rights. Defendant provided a statement to the investigators. Vanderhoof testified that defendant did not exhibit any signs of being under the influence and she did not appear to have any trouble understanding him.

Detective Deanna Gardner, of the MCSO testified that on May 22, 2015, she took 182 photographs of defendant. Gardner testified that defendant had bruises on her face, left arm, right arm, legs, and foot. Gardner said she did not know how or when defendant sustained these bruises.

The jury found defendant not guilty of first-degree attempted murder, third-degree possession of a weapon (knife) for an unlawful purpose, and fourth-degree unlawful possession of a weapon (knife). However, the jury found defendant guilty on all other counts, other than the certain persons not to have weapons count and three contempt counts to which defendant subsequently pled guilty.

Defendant appeals and raises the following arguments:

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-4297-17T4

POINT I
ADMISSION OF OTHER CRIME EVIDENCE OVER DEFENDANT'S OBJECTION WAS AN ABUSE OF DISCRETION AND DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

POINT II
TESTIMONY REGARDING THE PRESENCE OF PILLS AT THE SCENE OF DEFENDANT'S ARREST WAS IRRELEVANT AND UNDULY PREJUDICIAL AND SHOULD HAVE BEEN EXCLUDED FROM EVIDENCE.

POINT III
THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL WAS ERROR.

POINT IV
COMMENTS MADE BY THE PROSECUTOR DURING HER SUMMATION CONCERNING FACTS NOT IN EVIDENCE WAS GROSSLY PREJUDICIAL AND DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT V
THE JURY INSTRUCTION ON ENDANGERING THE WELFARE OF A CHILD WAS ERRONEOUS WHICH MANDATES REVERSAL OF THE CONVICTIONS ON COUNTS THIRTEEN AND FOURTEEN.

POINT VI
THE AGGREGATE OF ERRORS DENIED DEFENDANT OF A FAIR TRIAL. (Not Raised Below).

A-4297-17T4

We first consider defendant's contention that Judge Taylor erred by allowing the State to admit evidence of her other crimes, bad acts or wrongs pursuant to N.J.R.E. 404(b).  Defendant contends her emails, voicemails, and funeral arrangements were not relevant to whether she intended to kill R.L.  She also contends the State could have presented testimony regarding her relationship with R.L., without referencing the restraining order and the conduct that led to the issuance of that order.  She argues that the admission of the N.J.R.E. 404(b) evidence deprived her of a fair trial.

We review trial courts' evidentiary rulings under an abuse of discretion standard.  State v. Green, 236 N.J. 71, 80-81 (2018) (quoting State v. Willis, 225 N.J. 85, 96 (2016)).  Furthermore, we will not reverse the trial court's N.J.R.E. 404(b) determinations unless shown to be "a clear error of judgment."  Ibid. (quoting State v. Barden, 195 N.J. 375, 391 (2008)).

N.J.R.E. 404(b)(1) provides that admission of evidence of a person's other crimes, wrongs, or acts is not permitted "to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition."  The rule provides, however, that such evidence may "be admitted for other purposes, such as proof of motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b)(2).

In State v. Rose, 206 N.J. 141, 179 (2011), the Court held that the "threshold determination" under N.J.R.E. 404(b) is whether the State's evidence is intrinsic to the charged crime, in which case it must only satisfy rules relating to relevancy. Evidence is intrinsic to a charged offense (1) it "'directly proves'" the offense, or (2) pertains to "'uncharged acts performed contemporaneously with the charged crime [that] facilitate the commission of the charged crime.'" Rose, 206 N.J. at 180 (quoting United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)).

Where the evidence the State seeks to introduce is not intrinsic to the charged offense, the court must undertake an N.J.R.E. 404(b) analysis. Ibid. In State v. Cofield, 127 N.J. 328, 338 (1992), the Court established a four-part test to determine the admissibility of evidence under N.J.R.E. 404(b):

> (1) [t]he evidence of the other crime must be admissible as relevant to a material issue;
>
> (2) [i]t must be similar in kind and reasonably close in time to the offense charged;
>
> (3) [t]he evidence of the other crime must be clear and convincing; and

(4) [t]he probative value of the evidence must not be outweighed by its apparent prejudice.

Here, Judge Taylor held an evidentiary hearing on the State's motion to admit the N.J.R.E. 404(b) evidence, at which R.L. testified. Thereafter, the judge filed a thorough and well-reasoned written opinion. The judge noted that the State sought to admit an amended final restraining order as well as the underlying conduct that led to issuance of that order.[4]

Judge Taylor found that the restraining order was intrinsic to the burglary charges. The judge stated that to prove the two burglary counts, the State had to establish defendant was not "licensed or privileged to enter" the home. See N.J.S.A. 2C:18-2(a)(1). Because the restraining order barred defendant from the home, it was intrinsic to the burglary charges. The judge found, however, that the underlying conduct did not directly prove and was not intrinsic to the charged offenses.

Judge Taylor then considered whether the conduct that led to the issuance of the restraining order, defendant's email communications, and her voicemails

_____

[4] We note that a judge entered a temporary restraining order on May 12, 2012, and a final restraining order on June 20, 2012. Thereafter, defendant and R.L. engaged in negotiations regarding custody, which resulted in the issuance of an amended final restraining order. The State only sought to introduce the amended final order.

16

were admissible, applying the Cofield test. The judge found that the evidence regarding defendant's relationship with R.L. and the children was relevant in that it provided necessary background information. The evidence regarding defendant's relationship with R.L. was reasonably close in time to the charged offenses, there was clear and convincing evidence concerning the relationship, and the probative value of the evidence was not outweighed by its apparent prejudice.

The judge also found that defendant's emails and voicemail messages were relevant to a material issue, specifically defendant's motive and intent in attempting to kill R.L. The judge noted that the messages showed defendant's "anger and bitterness" to R.L. This evidence also provided necessary background information for the charged offenses.

In addition, Judge Taylor found that the uncharged acts of wrongdoing were established by clear and convincing evidence, including R.L.'s testimony and the communications themselves. The judge found that the probative value of the evidence outweighed any prejudice to defendant, and there was no source of evidence that was "equally probative." The judge cited Rose, in which the Court noted that "a wide range of motive evidence is generally permitted," even when prejudicial, "in recognition that [such evidence] may have "'extremely

high probative value.'"  206 N.J. at 105 (quoting State v. Long, 173 N.J. 138, 164-65 (2002)).

The judge decided, however, that he would limit the evidence regarding the conduct that led to the issuance of the restraining to the argument between R.L. and defendant, defendant slapping R.L. in the face, and the destruction of R.L.'s property.  The judge stated that the trial judge would issue limiting instructions to the jury with regard to any of defendant's prior threats to kill R.L., in order to limit any potential prejudice to defendant and to "channel the jury's consideration" of the evidence.

On appeal, defendant contends Judge Taylor erred in his ruling on the State's motion.  She contends the N.J.R.E. 404(b) evidence was not relevant to any material issue in the case, including her motive and intent.  She asserts the evidence did not directly prove any charged offense, the acts were not performed contemporaneously with the charged offenses, and the court should have excluded evidence that she slapped R.L. during the argument in May 2015.  She also contends the emails, voicemails, and her instructions regarding her funeral were not relevant to whether she intended to kill R.L.

We are convinced these arguments lack sufficient merit to warrant extended discussion.  R. 2:11-3(e)(2).  The record fully supports the judge's

findings of fact and conclusion that the evidence was either intrinsic to the charged offenses or otherwise admissible under Cofield. We conclude the trial court did not abuse its discretion by allowing the State to present the N.J.R.E. 404(b) evidence at trial.

III.

Next, defendant argues that the trial court erred by allowing the State to present testimony regarding the pills found at the scene on May 17, 2015. She contends the evidence was irrelevant and unduly prejudicial.

Relevant evidence is that "having a tendency in reason to prove or disprove any fact of consequence to the determination of the action," N.J.R.E. 401, and is admissible, absent a specific exception. N.J.R.E. 402. "Relevant evidence 'need not be dispositive or even strongly probative in order to clear the relevancy bar.'" State v. Santamaria, 236 N.J. 390, 405 (2019) (quoting State v. Cole, 229 N.J. 430, 447 (2017)). "[T]he test of relevancy" is "whether such evidence renders the desired inference more probable than it would be without the evidence. . . . [The] test is broad and favors admissibility." State v. Deatore, 70 N.J. 100, 116 (1976).

Relevant evidence may, however, "be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues,

19

or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. "[T]here must be a 'very strong' showing of prejudice to exclude evidence of a defendant's motive." State v. Castagna, 164, 180 (App. Div. 2008) (quoting State v. Covell, 157 N.J. 554, 565 (1999)).

Here, Judge Taylor determined the evidence defendant was in possession of the pills found at the scene was relevant to defendant's intent and purpose in entering the home on the evening of May 17, 2015. The judge noted that defendant had obtained with valid prescriptions, but they were not in their bottles. The judge also noted the number of pills involved and their location at the scene of the charged crimes. The judge observed that defendant brought the pills into the home along with a gun, extra bullets, a taser, and a knife.

Judge Taylor found that these facts were relevant to the elements of the offenses that the State had to establish at trial, including defendant's purpose and intent for entering the home. The judge also found the probative value of the evidence was not substantially outweighed by the prejudice to defendant from its admission and should not be excluded under N.J.R.E. 403. We are convinced the record fully supports the judge's findings.

Defendant argues, however, that without evidence from an expert, opining that the pills were capable of causing her death, the evidence that she possessed the pills was irrelevant to the charged offenses. She contends the evidence did not support the State's theory that she intended to kill herself after she killed R.L. We disagree. There is sufficient credible evidence in the record to support Judge Taylor's finding that the circumstances regarding defendant's possession of the pills were relevant to defendant's motive and intent in entering the home on the evening of May 17, 2015.

We reject defendant's contention that expert testimony was required to show that if defendant had ingested the pills, they could have caused her death. Based on its common experience and understanding, a reasonable jury could infer defendant intended to take her own life, and that defendant believed if she ingested the pills, they could cause her death. These matters were not "beyond the ken of the average juror." State v. Kelly, 97 N.J. 178, 208 (1984).

IV.

Defendant also contends the trial judge erred by denying her motion for a judgment of acquittal on count fourteen (originally count sixteen), in which she was charged with second-degree endangering the welfare of a child, Ji.L, in violation of N.J.S.A. 2C:24-4(a). Defendant argues that Ji.L. did not meet the

definition of an abused or neglected child because he remained in his room and was not present when the altercation that took place downstairs in the home. She contends that Ji.L. suffered no harm.[5]

Rule 3:18-1 provides that after the State has presented its case, the trial court may enter a judgment of acquittal on one or more of the offenses charged "if the evidence is insufficient to warrant a conviction."  The court should "deny the motion if 'viewing the State's evidence in its entirety, be that evidence direct or circumstantial,' and giving the State the benefit of all reasonable inferences, 'a reasonable jury could find guilt beyond a reasonable doubt.'"  State v. Felsen, 383 N.J. Super. 154, 159 (App. Div. 2006) (quoting State v. Reyes, 50 N.J. 454, 458-59 (1967)).

N.J.S.A. 2C:24-4(a) provides:

> (1) Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree.  Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.

---

[5] We note that in her brief, defendant does not argue that the judge erred by denying her motion for a judgment of acquittal on any other count of the indictment.  Therefore, defendant is deemed to have waived any argument regarding the court's ruling on the other counts that were the subject of the motion.  See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011).

(2) Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who causes the child harm that would make the child an abused or neglected child as defined in [N.J.S.A. 9:6-1], [N.J.S.A. 9:6-3], and [N.J.S.A. 9:6-8.21] is guilty of a crime of the second degree. Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.

[N.J.S.A. 2C:24-4(a).]

N.J.S.A. 9:6-1 defines "[a]buse of a child" as, in relevant part, "the performing of any indecent, immoral or unlawful act or deed, in the presence of a child, that may tend to debauch or endanger or degrade the morals of the child . . . ." In addition, N.J.S.A. 9:6-8.21(c) states that an "[a]bused or neglected child" includes a child under the age of eighteen

(4) . . . whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court; . . .

A-4297-17T4

In <u>State v. N.A.</u>, 355 N.J. Super. 143, 150-51 (App. Div. 2002), we noted that N.J.S.A. 2C:24-4(a) does not require that any act or omission by the parent or caretaker result in actual harm to the child. Rather, based on the plain language of N.J.S.A. 9:6-8.21(c)(4)(b), it is sufficient that the parent or caretaker's conduct exposes the child to a "'substantial risk'" of harm. <u>Ibid.</u>

We are convinced Judge Ahto did not err by denying defendant's motion for a judgment of acquittal on the endangering charge pertaining to Ji.L. While the State did not establish that Ji.L. was at substantial risk of physical harm, a reasonable jury could find that defendant's actions placed Ji.L. at a substantial risk of emotional harm, as a result of the altercation that was taking place in the house.

We reject defendant's contention that the State could not establish that she endangered the welfare of Ji.L. because he was not physically present in the room where the altercation occurred. As we noted previously, Ji.L. was in the house and heard what was going on downstairs. Ji.L. heard someone mention a gun and, in fear, he barricaded himself in his room. Based on this evidence, a reasonable jury could find, beyond a reasonable doubt, that defendant committed an immoral or illegal act in Ji.L.'s presence.

Defendant's arguments on this point lack sufficient merit to warrant further comment.  <u>R.</u> 2:11-3(e)(2).

V.

Defendant further argues that the assistant prosecutor made certain comments during her summation which were grossly prejudicial.  She contends the prosecutor's comments deprived her of a fair trial.

"[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive [the] defendant of a fair trial."  <u>State v. Timmendequas</u>, 161 N.J. 515, 575 (1999) (citing <u>State v. Chew</u>, 150 N.J. 30, 84 (1997)).  "To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense."  <u>State v. Nelson</u>, 173 N.J. 417, 460 (2002) (alterations in original) (quoting <u>State v. Papasavvas</u>, 163 N.J. 565, 625 (2000)).

"[P]rosecutors are permitted considerable leeway to make forceful, vigorous arguments in summation," but must generally limit their comments to the evidence presented and reasonable inferences therefrom.  <u>Id.</u> at 472.  On appeal, the court must assess the prosecutor's comments in the context of the entire record.  <u>Ibid.</u>  "[A] 'fleeting and isolated' remark is not grounds for

25

reversal." State v. Gorthy, 226 N.J. 516, 540 (quoting State v. Watson, 224 N.J. Super. 354, 362 (App. Div. 1988)).

When counsel fails to object to a prosecutor's remarks, to warrant reversal, the remarks must be "of such a nature as to have been clearly capable of producing an unjust result." Id. at 540 (quoting R. 2:10-2). Generally, if there is no objection, the remarks will not be deemed prejudicial. Timmendequas, 161 N.J. at 576. Counsel's failure to object suggests that counsel did not consider the remarks to be prejudicial at the time they were made. Ibid. Moreover, the failure to raise a timely objection deprives the trial court of the opportunity to address any impropriety. Ibid.

Here, the assistant prosecutor stated defendant had certain "options" for addressing the "issues" she had regarding the breakup of her relationship with R.L. The prosecutor said one of those "options" was to see the psychiatrist defendant had been seeing concerning visitation with the children. Defendant's counsel objected to that comment.

The State concedes the prosecutor's reference to defendant's psychiatrist was improper because it was not directly supported by testimony. However, this was a fleeting, isolated comment. When viewed in the context of the prosecutor's entire summation, the comment was not clearly and unmistakably

26

improper. In addition, the trial judge issued a timely curative instruction, informing the jury it must be guided by its own recollection of the evidence. We must assume the jury followed the court's instructions. Nelson, 173 N.J. at 447.

The prosecutor continued her closing argument. She said the jurors had taken an oath "to decide this case fairly and impartially and without passion and sympathy." She concluded by stating that if the jurors "find the defendant not guilty, she doesn't need your sympathy. And, if you find her guilty, she doesn't deserve it. Thank you." Defense counsel did not object to these comments.

On appeal, defendant argues that the prosecutor's final remarks "were meant to generate sympathy for the victim" and were "totally inappropriate." Again, we disagree. It appears the prosecutor was merely attempting to remind the jury that it must decide the case 'without passion and sympathy."

However, even if the comment is deemed to be improper, when viewed in the context of the prosecutor's entire summation, the comment was not clearly and unmistakably improper and did not substantially prejudice defendant's right to a fair trial. It was an isolated, fleeting remark, and defense counsel's failure to object indicates that counsel did not view the comment as prejudicial when it was made.

## VI.

Defendant argues that the trial judge erred in instructing the jury on the endangering charges in counts thirteen and fourteen (originally counts fifteen and sixteen). Defendant contends the judge erred by instructing the jury that to establish that a child was an abused child, the abuse "shall consist of the following act or acts. The performing of any indecent, immoral or unlawful act or deed in the presence of a child that may tend to debauch or endanger the morals of a child."

Defendant contends the charge was not appropriate for this case. She contends she did not perform any actions that had any impact upon the morals of either child. Defendant contends the reference to acts that could "debauch, endanger or degrade the moral" of a child only pertain to sexual offenses. She therefore argues that the convictions on counts thirteen and fourteen should be set aside.

"[A]ppropriate and proper charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004) (internal quotations omitted)). The trial court must provide the jury with "a comprehensible explanation of the questions that [it] must determine,

including the law of the case applicable to the facts that the jury may find."  Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).

"Erroneous instructions on matters or issues that are material to the jury's deliberation are presumed to be reversible error in criminal prosecutions."  State v. Jordan, 147 N.J. 409, 422 (1997) (citing State v. Warren, 104 N.J. 571, 579 (1986)).  When reviewing the correctness of a jury instruction, we must examine the entire charge.  State v. R.B., 183 N.J. 308, 324 (2005).

Where, as in this case, no objection is raised to the instruction, we consider the instructions for plain error and must determine if the instructions were "clearly capable of producing an unjust result."  State v. Alexander, 233 N.J. 132, 141-42 (2018) (citing R. 2:10-2).  "The mere possibility of an unjust result is not enough."  Id. at 142 (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)).  "Rather, [t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."  Ibid. (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Here, the judge read nearly verbatim from the applicable Model Jury Charge for N.J.S.A. 2C:24-4(a)(2) (Model Jury Charges (Criminal), "Endangering the Welfare of a Child, Abuse or Neglect (Second Degree)" (rev.

Mar. 9, 2015)). In defining the harm that would make a child abused or neglected, the judge drew upon the relevant section of N.J.S.A. 9:6-1.

As stated previously, N.J.S.A. 9:6-1(e) defines "abuse of a child" as "the performing of any indecent, immoral or unlawful act or deed, in the presence of a child, that may tend to debauch or endanger or degrade the morals of the child." We reject defendant's contention that the statute only pertains to conduct of a sexual nature. Neither N.J.S.A. 9:6-1(e) nor N.J.S.A. 2C:24-4(a)(2) limits the prohibited conduct to sexual conduct, or references "sexual conduct" or "sexual offenses."

We are convinced the charge was appropriate. A reasonable jury could find that defendant's alleged actions, which included aggravated assault upon J.L, were indecent, immoral, or unlawful acts. The jury also could reasonably find that the performance of such acts, while Je.L. and Ji.L. were at home, could "tend to" endanger or degrade the morals of those two children.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4297-17T4